1   Allison W. Maxim
    MAXIM LAW, PLLC
2   Ramsey Professional Building
3   311 Ramsey Street, Suite 201
    Saint Paul, Minnesota 55102
4   Phone: (651) 294-2407
    Fax: (651) 294-2361
5   Allison@Maxim-Law.com
6   Attorney *pro hac vice* for Respondent

7   Diane Kaer
    Attorney at Law
8   California State Bar Membership No. 120648
    14827 Energy Way
9   Apple Valley, Minnesota 55124
    Phone: (952) 432-4131
10  Fax: (952) 432-4822
    Diane@Kaerlaw.com
11  Attorney for Respondent

12                  UNITED STATES DISTRICT COURT

13                 EASTERN DISTRICT OF CALIFORNIA

14

15  DANIEL CARLOS CHIRAMBERRO
    LARRATEGUI,                          Case No.:  2:13-cv-01175-JAM-EFB
16          Petitioner,

17  vs.                                  RESPONDENT VALERIA
                                         EGUIGUREN LABORDE'S TRIAL
18  VALERIA EGUIGUREN LABORDE,           BRIEF
            Respondent.
19

20                         INTRODUCTION

21          This matter is before the Court on Respondent, Daniel Carlos Chiramberro

22  Larrategui's, Petition for Return of Child and Respondent, Valeria Eguiguren

23  Laborde's, Counter-Petition opposing the return of Child pursuant to the Convention on

24

the Civil Aspects of International Child Abduction, done at the Hague on October 25, 1980 (hereafter "the Hague Convention") and the International Child Abduction Remedies Act (ICARA).

The parties are the parents of one (1) minor child, referred to herein as S.C. S.C. was born in December 1999 and is thirteen (13) years old. Petitioner (hereinafter referred to as "Father") claims that S.C. is a habitual resident of Argentina, is being wrongfully retained in the United States, and should be immediately returned to Argentina.

Respondent (hereinafter referred to as "Mother") does not dispute that S.C. was a habitual resident of Argentina or that Father has a right of custody. She is asserting an exception under Article 13(b) of the Hague Convention. She will prove by clear and convincing evidence at trial that S.C. (1) faces grave risk that her return to Argentina will expose her to physical or psychological harm, or otherwise place her in an intolerable situation, pursuant to Article 13(b) of the Hague Convention and (2) that returning S.C. violates fundamental principles relating to the protection of human rights and fundamental freedoms.

Additionally, Mother is asking that in the event this Court orders the return of S.C. to Argentina, that the court impose "undertakings" and that this Court find that an award of attorney's fees to Father is clearly inappropriate pursuant to ICARA §11607(b)(3).

1

LAW AND ARGUMENT

2

**I.    S.C. Faces Grave Risk of Physical or Psychological Harm or wWill**
3      **Otherwise be Placed in an Intolerable Situation if She is Returned to**
       **Argentina**.
4

5      The Hague Convention, to which the United States and Argentina are

6      contracting states, "generally requires courts in the United States to order children

7      returned to their countries of habitual residence, if the courts find that the children have

8      been wrongfully removed to or retained in the United States." <u>Chafin v. Chafin</u>, 133 S.

9      Ct. 1017, 1021 (2013). However, Article 13(b) of the Hague Convention provides that

10     this Court is not bound to order the return of a child to her country of habitual residence

11     if it finds that there is a grave risk that the child's return would expose the child to

12     physical or psychological harm or otherwise place the child in an intolerable situation.

13     This exception must be proven by clear and convincing evidence. 42 U.S.C.

14     §11603(e)(2)(A).

15     While the grave risk exception is to be construed narrowly, Courts must balance

16     the Hague Convention's goals of ensuring a child's prompt return and protecting a child

17     from harm. The official commentary to the Convention notes that "the interest of the

18     child in not being removed from its habitual residence . . . *gives way before the primary*

19     *interest of any person on being exposed to physical or psychological danger or being*

20     *placed in an intolerable situation.*"   Elisa Perez-Vera, *Explanatory Report: Hague*

21     *Conference on Private International Law.*  Emphasis added.

22

23     An inquiry into the Article 13(b) exception must encompass more than a bare

24     determination of whether a child has suffered direct physical abuse. In making a "grave

risk" determination, "the court may consider the environment in which the child will reside upon returning to the home country." <u>Nunez-Escudero v. Tice-Menley</u>, 58 F.3d 374, 378 (8th Cir. 1995). Indeed, such an evaluation is not optional. "To ensure that the child is adequately protected, the Article 13(b) inquiry must encompass some evaluation of the people and circumstances awaiting that child in the country of his habitual residence." <u>Id</u>.

> **A.    The Overwhelming Evidence Will Clearly Show S.C. is a Vulnerable Child with Diagnosed Medical and Psychological Conditions Who will be Placed at Grave Risk of Harm or an Otherwise Intolerable Situation if She is Returned to Argentina.**

A grave risk of harm exists "in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection." <u>Friedrich v. Friedrich</u>, 78 F3d 1060 (11th Cir. 2008). The case before this Court exemplifies that of a child who has extraordinary emotional dependence in that she was recently diagnosed with borderline intellectual functioning and a mood disorder, much more severe diagnoses than mere dysphasia, or language disorder, as previously recognized in Argentina. What may not pose a grave risk of psychological harm to most children, poses a grave risk of psychological harm to S.C. because her disability leaves her extremely emotionally and psychologically vulnerable to what otherwise may be ordinary stressful situations.

The evidence on the record thus far shows that Mother had concerns about S.C.'s behavior, and emotional and psychological condition, for several years. Specifically she had concerns about S.C. growing into an adolescent girl but lacking in development and maturity for her age. She was concerned each time she had visits with S.C. that S.C.

came to the United States with an infestation of lice and exhibited the inability to care for her own hygiene. She also had concerns about S.C.'s mental health and psychological fragility as well as her limited cognitive functioning.

Since Father refused to cooperate with her to have S.C. more extensively evaluated in Argentina, it was necessary for Mother to request the Argentinian courts to order testing and evaluation of S.C. However, the Argentinian court refused to consider Mother's requests and order testing and evaluation of S.C. Thus, Mother had to have S.C. evaluated on her own when she spent time with S.C. as allowed by Father. The results of the evaluations Mother sought out paint a much more complicated and severe picture of S.C.'s disabilities than what Father is willing to acknowledge.

Most recently S.C. was evaluated by Dr. Pilar Bernal and Dr. Shauna Joye at the Autism Spectrum Disorder Center and was diagnosed as having borderline intellectual functioning and a mood disorder. (Document 18-3, p. 14). Dr.'s Bernal and Joye found in their evaluation of S.C. that "she is likely to be confused and frustrated by the large discrepancy between her weakness and her other strengths and abilities. Her difficulties put her at risk for developing more stress, depression, and anxiety as she gets older." (Document 18-3, p. 13). The doctors go on to report "S.C. "is likely to have difficulties negotiating the multiple and complex demands of the higher school grades. She should be carefully monitored for increases in mood disorder symptoms resulting from the increased demands expected of her." Id.

The evaluation by Dr.'s Bernal and Joye confirm Dr. C. Joanne Crawford's suspicion that S.C. may have borderline intellectual functioning. (Document 18-1, p. 5 and 6). Dr. Crawford performed two evaluations of S.C. based on Mother's concerns for S.C. The first evaluation was completed in February 2012 and Dr. Crawford diagnosed S.C. with dysthymic disorder, mixed receptive-expressive language disorder,

learning disorder NOS, and disorder of Infancy, Childhood or Adolescence NOS. (Document 18-1, p. 6). In hopes of getting S.C. the help she needed in Argentina, Mother presented Dr. Crawford's evaluation to the Argentinian Court but her application to the court was intentionally delayed by Father and ultimately ignored by the court.

Mother persisted in her efforts to get help for her daughter; however, and again had her evaluated by Dr. Crawford one year later. Dr. Crawford spent three sessions with S.C. and received input from the professionals in Argentina as well as from Father. Dr. Crawford notes that S.C.

> shows a coping deficit as indicated by a significantly elevated Coping Deficit Index score. She appears to be in a state of chronic and sustained stimulus overload resulting from persistant difficulty in mustering psychological resources to cope with the demands being imposed on her by internal and external events in her life. Consequently, she is at risk for recurrent episodes of overt anxiety, tension, nervousness, and irritability.

(Document 18-2, p. 3). Dr. Crawford concluded in her report that S.C.'s condition is serious, stating:

> [h]er mental health has deteriorated over the past year. Her mental health is at risk. There are questions related to her emotional safety with her father, which appear to have substance . . . Father appears to be unaware of many of her emotional and psychological needs. He seems to care about his daughter, but does not have much sense as to what a child basic physical and psychological needs are. It is my professional opinion that to return to her father's care represents a danger to her mental health. She runs the risk of a psychotic break.

(Document 18-2, p. 7).

The evaluations and reports submitted to this Court present clear and convincing evidence S.C. is psychologically and emotionally vulnerable and that returning her to Argentina will place her at grave risk of harm or an otherwise intolerable situation. As such, this court must dismiss Father's petition and decline to return S.C. to Argentina.

1

2

3

**B.    Father's Historical Pattern of Alienation of Mother From S.C. Constitutes Clear and Convincing Evidence that S.C. will be Placed at Grave Risk of Harm or an Otherwise Intolerable Situation if She is Returned to Argentina.**

4

5

6

7

Father has exhibited a pattern of aggressive and angry behavior towards Mother over the past six (6) years that has affected and will continue to affect S.C.'s psychological functioning.  In fact, it is not a stretch to say that Father has made every effort over the years to alienate S.C. from Mother, including:

8

9

10

11

12

13

14

- Intentionally blocking her visits with S.C. – and imposing severe financial conditions upon Mother prior to visits with S.C.
- disparaging Mother to S.C.
- blocking communication between Mother and S.C. by not being home for calls, not setting up an internet connection to facilitate communication, and by hiding on a trip with S.C. with Mother having no idea where they were.
- keeping S.C. away from Mother for a year in 2009 to 2010
- telling Mother that S.C. does not need her and she should leave them alone
- making threats to Mother after she decided to retain S.C. in California
- making threats to Mother's family in Argentina
- filing baseless criminal charges against Mother in Argentina

15

16

17

Dr. Crawford, who had a conversation with Father on January 29, 2013 indicates that he "was clearly hostile towards Ms. Eguiguren, blaming her for abandonment." (Document 18-2), p. 6).

18

19

20

21

22

23

24

Such a blatant pattern of hostility toward Mother poses a grave risk of psychological harm and an intolerable situation for a vulnerable 13-year-old girl who loves both her mother and father.  This kind of alienation is damaging to any child, but for S.C. as a child already at risk due to her cognitive disability and psychological vulnerability, she will be placed at grave psychological risk and an intolerable situation if she is returned to Argentina.  She would be returned to a Father who will now

certainly attempt to erase Mother from S.C.'s life based upon Mother's retention of S.C. in California. It is an intolerable situation because the court in Argentina will not help S.C. despite her extreme vulnerability. With the Argentinian court's failure to even open a case to review the concerns Mother has had for the past few years, S.C. is at grave risk of psychological harm and an intolerable situation if she is returned to Argentina. The Court Argentina will not act to protect S.C. in time to prevent severe psychological harm. Evidence will be presented at trial showing the Argentinian court system in child custody matters is extremely slow, taking up to 3-4 years for a custody matter to be resolved. S.C. will be 17 in 4 years, which is a lifetime for a vulnerable child such as S.C. If she is returned to Argentina, especially given her medical and psychological issues she will surely suffer grave psychological harm by Father's continued efforts to alienate her from Mother.

The evidence in this matter shows that Father will say whatever it takes to alienate Mother from S.C. and try and convince authorities that he has been the sole caretaker of the minor child since her birth. In the Supplemental Declaration Father submitted to this Court on October 24, 2013, he states "[S.C.] has resided with me in Buenos Aires since her birth." This statement is a gross exaggeration of reality and the evidence will show that after Mother and Father ended their relationship and separated when S.C. was two years old, S.C. lived with Mother and Mother was S.C.'s primary caregiver and custodian for the next five years.

Father goes on in his Supplemental Declaration to state "Approximately seven (7) years ago, Respondent met a paramour, became pregnant and abandoned both [S.C.]

and me for traveling to the United States. Since then I have been the sole caretaker and parent for [S.C.]."  Again, the evidence already on the record and that which will be revealed at the trial will establish that Father's statements are egregious misrepresentations of fact.  Mother never abandoned her daughter, but yet Father has repeatedly perseverated that idea to the courts, to the professionals involved with S.C. in Argentina, to Dr. Crawford, and surely to the child herself.

The evidence already on the record shows that Mother did not abandon S.C. but rather sought a better economic situation for herself and S.C. The evidence shows that it has been Father that has engaged in a campaign to alienate Mother and to convince S.C. that Mother has in fact abandoned her.  Immediately after Mother's relocation to the United States with a promise that S.C. would follow, Father claimed Mother abandoned S.C. and threatened she would never see her again.  He obstructed communication between Mother and S.C. by not being home for phone calls and not setting up an internet connection as promised.  Mother immediately went back to Argentina in July 2007 to see S.C. Since then Mother has consistently travelled to Argentina over the past several years to spend time with S.C. She proactively attempted to be an active and integral part of S.C.'s life in Argentina only to be met by Father's aggressive blocking of her relationship with S.C.

The evidence at trial will further reveal how Father refused a visit between Mother and child in December/January 2010.  Mother had not seen S.C. since 2009 and it was in the summer/fall of 2010 that Mother, under extreme duress from not seeing

S.C. for a year and being threatened with $10,000 fine that she caved into Father's demand for custody of the child.

This cruel alienation of S.C. from Mother will only continue and poses a grave risk of psychological harm to this young, vulnerable girl.  As such, this Court must find S.C. faces a grave risk of psychological harm and will otherwise be placed in an intolerable situation if she is returned to Argentina.

**C.      Father's Denial of or Refusal to Acknowledge S.C.'s Serious Medical and Mental Health Issues Constitutes Clear and Convincing Evidence S.C. will be Placed at Grave Risk of fHarm or an Otherwise Intolerable Situation if She is Returned to Argentina.**

The evidence on the record already shows that Father is in severe denial of S.C.'s serious medical and mental health issues, or that he intentionally refuses to acknowledge them.  Father claims that S.C.'s cognitive disability is recognized and being treated in Argentina.  He submitted a lengthy summary in Spanish of the child's medical appointments at Hospital Aleman (Document 12) likely in an attempt to show he is attending to the child's medical needs.  However, what Father fails to clarify to this Court is that many of the records noted in his submission are appointments that he attended without the child.  Further, a translation of the most relevant of the medical records shows that S.C. was not in fact doing well at all in Argentina.

For example, the medical record from July 7, 2009 states: "We worked with 'play with stories.' She is very apathetic. She has trouble paying attention and organizing herself.  Andrea told me that she failed in all tests." (Document 26-5, p. 4). Another note in the medical records from November 9, 2010, indicates that S.C. "is

very angry, distressed, reluctant to work.  She has this attitude for several sessions."

(Document 26-5, p. 7-8).  And a third notation in the records dated May 18, 2010

reveals: "[s]chool asks for advice to be able to manage with the father, who is invading

[S.C.'s] school space."  (Document 26-5, p. 7).

Further evidence of Father's refusal to acknowledge S.C.'s serious medical and

mental health issues is included in the 2013 report of Dr. Crawford.  She indicates she

learned from Father during a conversation that "[h]is perspective on [S.C.'s] difficulties

was that they were solely restricted to a speech pathology.  He said that she had

difficulties in language of a developmental nature."  (Document 18-2, p. 6).

This denial to acknowledge the child's basic serious medical condition and her

mental health issues has been extremely damaging to S.C. and will put her at grave risk

of harm and an intolerable situation if she is returned to Father.  In Argentina, she does

not have a support system that can actively work with her every day as recommended

by Dr. Bernal and with Father's refusal to even acknowledge S.C.'s medical and mental

health issues, he will surely not implement the recommendations of the doctors from

the United States. As such, this Court must find S.C. faces a grave risk of psychological

harm and will otherwise be placed in an intolerable situation if she is returned to

Argentina.

> **D.** **The Environment in Argentina is Seriously Inadequate to Address S.C.'s Medical and Mental Health Issues and She will Face a Grave Risk of Harm or an Otherwise Intolerable Situation if She is Returned to Argentina.**

No one in Argentina recognizes S.C.'s serious medical and mental health issues. Not Father, not her school where she is only given an aid and kept out of English classes, not the speech therapist, not Hospital Aleman, and not the Argentinian court. S.C. is only recognized as having a speech and language disorder in Argentina. However, her medical and psychological issues are real and serious, as evidenced by the expert reports submitted to this Court, and they are being actively addressed by Mother in the United States. Mother will testify at trial about the daily rehabilitation S.C. receives here in the U.S. that includes cooperation among S.C.'s school and teachers, her psychologist, and her family.

Dr.'s Bernal and Dr. Joye recommend guidelines to manage S.C.'s behavior that focus on highly structured and specific interventions – interventions she was not receiving nor will she receive in Argentina due to Father's demonstrated failure to acknowledge and accept the seriousness of S.C.'s vulnerabilities. Mother on the other hand has taken the initiative to obtain a proper diagnosis for S.C. and immediately began implementing the recommendations of Dr.'s Bernal and Joye. Mother will testify that the daily process of assisting S.C., setting proper boundaries for her behavior, and rewarding her efforts takes a community of individuals to work cooperatively on a daily basis to support S.C. so she can grow and develop into a mentally and physically healthy young woman.

One of the recommendations of Dr.'s Bernal and Joye is to "give commands in a neutral, matter-of-fact but caring manner." The evidence on the record reveals that the Father is incapable of relating to S.C. in a neutral manner that will assist her to grow into a healthy young woman. For example, the following exchange between S.C. and Father on Facebook on March, 3, 2013 shows Father's cruel manner of punishing S.C. for something completely out of her control:

**Daniel Ch Larrategui** (6:52)
Sol I'm dad…. I love you a lot and I will never abandon you, stay calm that everything will be fine… Luca send you a tongue kiss!!!! Dad.

**Daniel Ch Larrategui** (9:50)
Sol accept me in your Facebook if not we will never be able to talk again…the two facebooks that you had before your mom closed them… Luca is still here… dad.

**Daniel Ch Larrategui (**20:33)
Sol accept me, it's DAD, otherwise we cannot talk … ok???

**Daniel Ch Larrategui (**21:05)
  Valeria you are violating the Sol's privacy… a lot of friends called me because Sol doesn't answer the chat… Careful with what you are doing… everything is recorded…

**March 1st**
**S.C.**  (18:26)
Hi dad I wanted to tell you that I looooooove you with all my soul and I also miss you and want to send you a lot of kisses for you and luca a kiss sol.

  **March 3rd**

**S.C.  (18:26pm)**
Hi

**Daniel Ch Larrategui** (18:39)
Do you know what Luca did?

**S.C**(18:40)
 What

**Daniel Ch Larrategui**(18:40)
Who is Luca?

**S.C.** (18:40)
My dog.

**Daniel Ch Larrategui**(18:40)
What color?

**S.C.** (18:41)
Light brown.

**Daniel Ch Larrategui**(18:41)
How much does he weight?

**S.C**(18:41)
40 kilos.

**Daniel Ch Larrategui**(18:41)
No.

**S.C** (18:41)
 How much

**Daniel Ch Larrategui**(18:42)
 You were the owner that would never abandon him and you did… you
lied to me.

**S.C** (18:43)
Nnnnnnnnnnnnnn

**Daniel Ch Larrategui**(18:43)
You were supposed to start your 7th grade tomorrow in Armonia and you
and your mom lied to me.

**S.C**(18:43)
Don't make me be sad. Stop it!

**Daniel Ch Larrategui**(18:43)
Now you are telling me that you started school there??

**S.C** (18:44)
I wanted to tell you the truth daddy

**Daniel Ch Larrategui**(18:44)
I'm very sad here and you know it.

**S.C**(18:44)
I know you are sad daddy, you know that I need both my parents.

**Daniel Ch Larrategui**(18:45)

This is not you Sol…. You said another thing to the psychologist… or you also forgot.

**S.C**(18:45)
 About what…

**Daniel Ch Larrategui**(18:46)
You know it is written in Tribunales and the judge has it.
You were supposed to come back with your mother, finish your school in Armonia and you, your mom and I were going to talk about what would you like in the future… that's what we were supposed to do, not what they are doing to you.
IN THIS WAY NOBODY IS OK, NOR YOU, NOR ME NOR YOUR MOM, WE ALL LOST, YOU ARE KIDNAPED AND I TOLD YOU THIS WOULD HAPPEN.

**S.C**(18:49)
I'm not kidnaped lier

**Daniel Ch Larrategui**(18:50)
IF THEY HAD TO RETURN YOU TO THE COUNTRY ON JANUARY 29th AND THEY DIDN'T… THAT'S ILEGAL

**S.C**(18:50)
Ok

**Daniel Ch Larrategui**(18:51)
You went there on vacation and were supposed to return to go to Pinamar all together and they didn't. Your mother and your grandmother that didn't go to pick you up.  That's the truth … and you know you had to finish school here… no there.

**S.C** (18:52)
Stop making me sad dad.

**Daniel Ch Larrategui**(18:53)
NOT LIKE THIS. ALL THIS IS A LIE AND YOU ALLOWED IT.

**S.C** (18:53)
Stop it now
Please

**Daniel Ch Larrategui**(18:54)

And don't ask me again about Luca because you abandoned him and you knew that you didn't have to do that.  You have your backpack ready and your books from 7th grade to start tomorrow in Armonia.. I'm waiting for you…dad…. All your companions are waiting for you here Sol…no there… What happens to you????

<u>S.C</u> (18:57)
Nothing.
What do you care

**Daniel Ch Larrategui**(18:57)
Ok Valeria …. Chau

<u>S.C</u> (18:57)
It's Sol
Seriously

**Daniel Ch Larrategui**(18:58)
You are not Sol… my daughter it's not like that.
She would never do that to me nor would lie to me.

<u>S.C</u>(18:58)
It's me, it's truuuuuuuuuuuuuuuuu daaaaaaaaaaaaaaaddd.
Bye Daddy good nigh.

**Daniel Ch Larrategui**(18:59)
If it's you ask to return here, finish Armonia as it has to be and we talk with your mother and you about your future and about what you like… Come back and do things right… trust me. Dad.

<u>S.C</u>(19:00)
Dream with me that we were dancing conga congaaaaaaa. Chauuuuuuu

**Daniel Ch Larrategui**(19:01)
 I don't dance with you anymore

<u>S.C</u>(19:01)
 It's Sol

**Daniel Ch Larrategui**(19:01)
I don't have a daughter who is called [S.C.] [S.C.] is manipulated and conditioned … on top of that now, she lies.

**Daniel Ch Larrategui**(19:19)
Who gave you Luca??

**S.C**(19:38)
Kari

**Daniel Ch Larrategui**(19:50)
 and what's the name of luca's sister?

**S.C**(19:51)
Valentina

**Daniel Ch Larrategui**(19:53)
 from luca

**S.C**(19:53)
Ok
how funny

**Daniel Ch Larrategui**(19:54)
You don't know because you are not Sol.
 I have your IP now.
Sorry

**S.C**(19:55)
Do you recognize me

**Daniel Ch Larrategui**(19:55)
How many puppies did alma had?

**S.C**(19:56)
3
Fede, valen and me.

**Daniel Ch Larrategui**(19:56)
Even worse. You are missing info….and you are also going to prison.
they are going to deport you
call Valeria , Sol's mom..who is up to 3 years in prison.
you have a face of psychologist….
if I were you I would look for a attorney or a layer…
Lets continue with the questions and bad answers from you…Keep going
so you add more years….

**4 de Marzo**

**Daniel Ch Larrategui**(18:40)
(hearth symbol)

**S.C.** (18:42)
Hello.
Don't talk to me about things that make me sad.

**Daniel Ch Larrategui**(18:43)
Ok , I love you, dad

**S.C**(18:43)
 How are you

**Daniel Ch Larrategui**(6:44)
 I tell you the truth or I lie to you?

**Sol Larrategui**(6:44)
the truth

(Document 26-2).

This conversation between Father and S.C. reveals how Father cannot control himself in establishing boundaries of what is appropriate neutral discussion with a vulnerable child and what is cruel and psychologically harmful to an innocent and vulnerable child.  This confirms Dr. Crawford's concern about S.C.'s emotional safety with her father as indicated in her report where she states "There are questions related to her emotional safety with her father, which appear to have substance. . . . Father appears to be unaware of many of her emotional and psychological needs.  He seems to care about his daughter, but does not have much sense as to what a child basic physical and psychological needs are."  (Document 18-2, p. 7).  The Facebook exchange between S.C. and Father overwhelmingly shows that Father does not understand S.C.'s basic psychological needs as a young girl, and his conversation with her certainly does not consider her vulnerability given her level of emotional and cognitive functioning.

Dr.'s Bernal and Joye also recommend S.C.'s parents and the other professionals working with her should "strive to arrive at a common view of S.C. that includes a full awareness of not only her challenges but her strengths as well. A goal for the family and for those involved with any aspect of S.C.'s care should be the coordination of their efforts." (Document 18-3, p. 14). The evidence shows that this was not happening and will not happen in Argentina.

Furthermore, if S.C. is returned to Argentina, she will be placed at grave risk of harm and an intolerable living situation in a large city where Father with whom she resides works very long hours. Evidence at trial will show that Father is the Director of Marketing during the day manages a local Buenos Aires rock band, The Police Station, at night. S.C. needs intensive daily treatment by a cohesive team of family and professionals will be returned to a place where she receives only routine speech therapy for a language disorder and is left alone for long periods of time with a nanny due to Father's long work hours. The speech intervention she received in Argentina is severely inadequate given her recent diagnosis, which explains why she was doing so poorly.

**I.    If This Court Finds S.C. Should be Returned to Argentina Despite the Grave Risk of Psychological Harm and Intolerable Situation Facing Her There, It Must Impose Undertakings Upon Father and The Court's in Argentina.**

Courts considering petitions for return of a child pursuant to the Hague Convention have the authority to impose conditions, known as undertakings, to ensure that a potential harm does not manifest when a child returns to the country of habitual residence. Courts have found that undertakings that do not offend notions of comity

may be appropriate in certain cases.  See 519 F.3d 33 (1st Cir. 2008), Kufner v. Kufner, 480 F. Supp. 2d 491 (D.R.I.  2007).  In this case it is difficult to imagine a scenario under which S.C. would be adequately protected from grave risk of harm or an otherwise intolerable situation.  However, Mother must raise this as a consideration lest it be barred on appeal.

Mother submits that if this Court orders S.C.'s return that it make particular findings about the seriousness of S.C.'s medical and psychological conditions and Father's alienation of S.C. from Mother and require Father to obtain a mirror order in Argentina of this Court's order.  Father should be required to immediately open an emergency custody case in Argentina to address the gravity of S.C.'s emotional and psychological conditions and allow the Court in Argentina to rule in a speedy manner on child custody. Father should be required not to oppose Mother's reasonable efforts to obtain an emergency court ruling on child custody.

**II.    If This Court Grants Father's Petition, It Must Find That an Award of Attorney's Feed Is Clearly Inappropriate Pursuant to 42 U.S.C. §11607(b)(3).**

Mother has been financially responsible for S.C. since her birth.  She primarily took care of S.C. until she was 7-years-old and paid child support and expenses for S.C. for the past several years.  She pays 100% of S.C.'s expenses when she is in her care and has paid for the medical evaluation and treatment S.C. is receiving in the United States.  She will present evidence at trial that she is not financially capable of paying Father's attorneys fees and continuing her support of S.C.

1    Additionally, there is evidence that proves Father is not paying his attorneys fees

2    and costs from his own financial resources.  He has received a grant from Argentinian

3    government that does not have to be paid back and he raised close to $13,000 (78,000

4    pesos) online in contributions to pursue his petition for return.  Having spent none of

5    his own financial resources to pursue his Hague petition, it is clearly inappropriate for

6    him to receive a windfall of thousands of dollars from Mother were she ordered to pay

7    his fees.

8                                              **CONCLUSION**

9    The evidence that will be presented at the trial in this case will firmly establish

10    that S.C. has serious medical and psychological conditions that Father refuses to

11    acknowledge.  Further, it will be shown by clear and convincing evidence that Father's

12    campaign over the past several years to alienate Mother from S.C. will only continue

13    and will place S.C. at grave risk of psychological harm or an otherwise intolerable

14    situation.  Finally, it will be clearly established that the environment to which S.C.

15    would be returned is seriously inadequate to address her medical and psychological

16    needs as a vulnerable child diagnosed with borderline intellectual functioning and a

17    mood disorder, posing a grave risk of psychological harm or an otherwise intolerable

18    situation if she is returned to Argentina.

19

20

21                                              Respectfully Submitted,

22    Dated: November 25, 2013              By: /s/ Allison W. Maxim
                                           **MAXIM LAW, PLLC**
23                                         Ramsey Professional Building
                                           311 Ramsey Street
24                                         St. Paul, Minnesota 55102

Telephone: (651) 294-2407
Facsimile: (651) 294-2361
E-mail:  Allison@Maxim-Law.com
Lead Attorney for Valeria Eguiguren Laborde


Diane Kaer
Attorney at Law
California State Bar Membership No. 120648
14827 Energy Way
Apple Valley, Minnesota 55124
Phone: (952) 432-4131
Fax: (952) 432-4822
Diane@Kaerlaw.com
Attorney for Valeria Eguituren Laborde