B J Fadem Esq.     SBN: 118819*
* Certified Family Law Specialist - State Board of Specialization
Ron B. Nerio, Esq, SBN: 251228
Magdalena A. LaBranch, Esq.  SBN: 262783
Corrine Gaxiola, Esq.  SBN: 270060
LAW OFFICES OF B J FADEM & ASSOCIATES, APC
111 N. Market Street,  Suite 910
San Jose, CA  95113
Telephone: 408-280-1220
Fax: 408-971-9940
bjfadem@fademlaw.com
Attorneys For Petitioner
DANIEL CARLOS CHIRAMBERRO LARRATEGUI

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIEL CARLOS CHIRAMBERRO LARRATEGUI,<br>　　　Petitioner,<br><br>vs.<br><br>VALERIA EGUIGUREN LABORDE,<br>　　　Respondent. | Case No.: 2:13-cv-01175-JAM-EFB |

PETITIONER'S TRIAL BRIEF

Date:     12/02/2013

Courtroom:    6

Judge: Hon. John A. Mendez

Larrategui vs. Laborde
2:13-cv-01175-JAM-EFB

Petitioner's Trial Brief

# TABLE OF AUTHORITIES

| STATUTES | PAGE |
|---|---|
| 42 U.S.C. §§ 11601-11610 | 5 ,8, 13 |
| 42 U.S.C. §11603 | 7, 11, 22 |
| 42 U.S.C. §11605: | 4 |
| 42 U.S.C. §11607 | 24 |
| California Family Code §3402 | 26 |
| California Family Code §3405 | 25, 26 |
| California Family Code, §3421 | 26 |
| California Family Code, §§3422 | 25, 26 |
| California Family Code §3423 | 25, 26 |
| California Family Code §3443 | 25 |
| California Family Code, §3444 | 26 |
| California Family Code §3445 | 26, 27 |
| California Family Code §3446 | 26 |
| California Family Code §3448 | 26 |
| California Family Code §3450 | 26 |
| California Family Code §3453 | 25, 26 |

Larrategui vs. Laborde
2:13-cv-01175-JAM-EFB

Petitioner's Trial Brief

| | CASES | PAGE |
|---|---|---|
| 1 | | |
| 2 | Abbott v. Abbott, 130 S. Ct. 1983, 176 L.Ed.2d 789 (2010)] | 6 |
| 3 | Avendano v. Smith, 806 F. Supp. 2d 1149, 1168 (D.N.M., 2011) | 17 |
| 4 | Cf. Nunez-Escudero v. Tice-Menley, 58 F.3d 374, 377 (8th Cir.1995) | 6, 15 |
| 5 | Danaipour v. McLarey, 286 F.3d 1, 14 (1st Cir. 2002) | 15 |
| 6 | England v. England, 234 F.3d 268, 270-71 (5th Cir. 2000)]. | 9 |
| 7 | Feder v. Evans-Feder, 63 F.3d 217, 224 (C.A.3 (Pa.), 1995)] | 10 |
| 8 | In re Marriage of Forrest and Eaddy (2006) 144 Cal.App.4th 1202 | 16 |
| 9 | Friedrich v. Friedrich (6th Circuit, 1996) 78 F.3d 1060, 1064 | 7, 9, 15 |
| 10 | Giampaolo v. Erneta, 390 F.Supp.2d 1269 (N.D. Ga., 2004)] | 7, 15 |
| 11 | Hazbun Escaf v. Rodriquez, 200 F.Supp.2d 603 (E.D. Va., 2002) | 22, 23 |
| 12 | March v. Levine, 249 F.3d 462(6th Cir., 2001) | 6, 7, 11, 13, 16, 23 |
| 13 | Maurizio R. v. L.C. (2011) 201 Cal.App.4th 616 | 16 |
| 14 | Miller v. Miller, 240 F.3d 392, 402 (4th Cir. 2001); | 9 |
| 15 | Mozes v. Mozes, 239 F.3d 1067, 1070 (9th Cir. 2001)). | 8, 13 |
| 16 | In re: the Application of, Mozes, 239 F.3d 1067, 1071 (9th Cir., 2001)] | 10 |
| 17 | In re Marriage of Paillier (2006) 144 Cal.App.4th 461 | 26 |
| 18 | Patrick v. Rivera-Lopez (D.P.R., 2013) | 8, 13, 15 |
| 19 | Pesin v. Osorio Rodriguez, 77 F.Supp.2d 1277 (S.D. Fla., 1999)] | 10 |
| 20 | Robert v. Tesson, 507 F.3d 981 (6th Cir., 2007)] | 9 |
| 21 | Rydder v. Rydder, 49 F.3d 369, 372 (8th Cir. 1995) | 8, 13 |
| 22 | Simcox v. Simcox (6th Cir. 2007) 511 F.3d 594, 604, | 15 |
| 23 | Souratgar v. Fair at page 28, (S.D.N.Y., 2012) | 23 |
| 24 | | |

B J Fadem Esq.     SBN: 118819*
*Certified Family Law Specialist - State Board of Specialization
Ron B. Nerio, Esq, SBN: 251228
Magdalena A. LaBranch, Esq.  SBN: 262783
Corrine Gaxiola, Esq.  SBN: 270060
LAW OFFICES OF B J FADEM & ASSOCIATES, APC
111 N. Market Street,  Suite 910
San Jose, CA  95113
Telephone: 408-280-1220
Fax: 408-971-9940
bjfadem@fademlaw.com
Attorneys For Petitioner
DANIEL CARLOS CHIRAMBERRO LARRATEGUI

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIEL CARLOS CHIRAMBERRO LARRATEGUI,<br>          Petitioner,<br><br>vs.<br><br>VALERIA EGUIGUREN LABORDE,<br>          Respondent. | Case No.: 2:13-cv-01175-JAM-EFB<br><br>PETITIONER'S TRIAL BRIEF<br><br>Trial Date:   12/02/2013<br>Courtroom:   6<br>Judge:    Hon.  John A. Mendez |

## I.

## <u>INTRODUCTION</u>

Petitioner is the Father and Respondent is the Mother of the minor child, S.C., born in Buenos Aires, Argentina on December 12, 1999.

The parties lived together with S.C. in Argentina until 2002.  Petitioner and Respondent continued to reside in Argentina, in separate homes.  The minor child, S.C. spent equal amount of time with both parents from 2002 until 2007.

Larrategui vs. Laborde
2:13-cv-01175-JAM-EFB

Petitioner'sTrial Brief
Page 1

1           In May of 2003, S.C. was diagnosed with developmental dysphasia, expressive

2   subtype, and referred for neuro linguistic, psycho pedagogical and neurological pediatric

3   treatment.  She requires attending school with an integrated education teacher and evolution

4   control.

5           In 2007, Respondent relocated to the United States and married.  S.C. remained in

6   Argentina with Petitioner.  Although Respondent alleges that the parties had a "verbal"

7   agreement that S.C. would be sent to live with Respondent in the United States when she was

8   settled; Petitioner denies same.  This disputed fact is irrelevant, because in September 2010,

9   Petitioner obtained an order from the Argentina court granting him full custody of S.C.

10  Respondent participated in the litigation and proceedings in Argentina.  Any such agreement, its

11  validity, and its effect would have been raised before the Argentina court during these

12  proceedings and adjudicated.  The proceedings resulted in the September 27, 2010 Order

13  granting Petitioner full custody of S.C.

14          Respondent continued to reside in the United States and S.C. continued to reside with

15  Petitioner in Argentina.

16          Because of her specialized needs, S.C. has been attending a special private school in

17  Argentina – "Armonia".  Armonia is a private institution recognized by the education authorities

18  that integrates students with Special Education Needs.  S.C. has flourished at the school.

19  Although Armonia is a "bilingual" school, because of S.C.'s special education needs, she does

20  not attend the afternoon session in that it is taught in English.  The doctors and her specialized

21  teachers have determined, that due to her diagnosis and progress, it would be extremely

22  detrimental for S.C. to be forced to learn English when she is still having such difficulty with her

23

24

1  "mother tongue". [Ergo, Respondent's continued wrongful retention of S.C. in the United States
2  grows ever more detrimental to the child].

3      Respondent arrived in Argentina for a visit in November 2012. During her visit,
4  Respondent initiated judicial proceedings in the Federal Ordinary Civil Court, Number 88 (a
5  Court on Family Matters) to obtain authorization to travel with S.C. to the United States for a
6  visit. The Argentina court granted Respondent's request and issued an Order pursuant to
7  agreement on November 29, 2012 that Respondent may travel with S.C. to the United States for
8  a visit from December 13, 2012 until January 29, 2013. Respondent, Petitioner *and S.C.* was
9  represented in the course of securing this order.

10      Respondent failed and continues to refuse to return S.C. into Petitioner's custody in
11  Argentina. She first claimed maternal grandfather was gravely ill and then finally admitted she
12  had no intention of returning the child to Argentina regardless of the court's orders.

13      Respondent is in violation of Argentina court orders. She filed an appeal with the court
14  in Argentina. In the course of these proceedings, Respondent made all the same allegations [and
15  more] that she asks this court to consider: she stated S.C. was not receiving the proper medical
16  care required of her condition – attaching to her filings in Argentina the *same* reports that she
17  seeks review of by this court. In its November 2013 Order, the Argentina court clearly indicated
18  that they were *still* considering the custody issues raised by Respondent and that Argentina has,
19  and can continue to provide the necessary treatment for S.C.

20      Argentina further issued a declaration pursuant to Article 15 of the Hague Convention
21  Civil Aspects of International Child Abduction; declaring Argentina to be the habitual residence
22  of S.C. and that Argentina has made a determination that she is being wrongfully retained in the
23  United States by Respondent.

24

Larrategui vs. Laborde
2:13-cv-01175-JAM-EFB

Petitioner's Trial Brief
Page 3

## II.

## THE HAGUE CONVENTION: "ICARA"

A.     PROCEDURAL

Article 30 of the Hague Convention on the Civil Aspects of International Child Abduction provides: "Any application submitted to the Central Authorities or directly to the judicial or administrative authorities of a Contracting State in accordance with the terms of this Convention, together with documents and any other information appended thereto or provided by a Central Authority, shall be admissible in the courts or administrative authorities of the Contracting States." This is codified by the United States in 42 U.S.C. §11605: "With respect to any application to the United States Central Authority, or any petition to a court under section 4, which seeks relief under the Convention, or any other documents or information included with such application or petition or provided after such submission which relates to the application or petition, as the case may be, no authentication of such application, petition, document, or information shall be required in order for the application, petition, document, or information to be admissible in court."

Therefore, for the purposes of these proceedings, all documents [Argentina Orders, Medical Records and Reports, School Records, Affidavits and any and all other documents submitted with and in conjunction with the Petition are admissible.

B.     SUMMARY OF ISSUES

Petitioner seeks immediate return of S.C. to Argentina – a preponderance of the evidence supports that Argentina is the habitual residence of the child, Petitioner was exercising his

Larrategui vs. Laborde
2:13-cv-01175-JAM-EFB

Petitioner's Trial Brief
Page 4

1 custody rights; and Respondent has wrongfully retained the child in the United States since

2 January 29, 2013.

3   Respondent requests a denial the Petition and return of S.C. pursuant to Article 13(b),

4 Article 13 and Article 20 of the Convention of Civil Aspects of International Child Abduction.

5   C.   <u>PETITION FOR IMMEDIATE RETURN PURSUANT TO ICARA</u>

6   Petitioner pursued his remedies for the immediate return of S.C. to his custody in

7 Argentina. In submitting his request through the United States Department of Children Services,

8 a Petition pursuant to the Hague Treaty Convention on the Civil Aspects Of

9 International Child Abduction was filed on March 20, 2013.

10   As a result, on May 10, 2013, the District Attorney of San Joaquin County filed a Petition

11 for the Immediate Return of the minor child and for an order to locate and pick up the child.

12   Thereafter, by and through her counsel, Respondent removed the matter to federal

13 jurisdiction on June 13, 2013. The United States District Court of the Eastern District of

14 California issued a minute order that Respondent was to serve Petitioner with the Notice of

15 Removal in thirty (30) days -- that never occurred. Neither Petitioner, nor his Argentina counsel,

16 Fabiana Quaini was served as required. As a result, it was not until current private counsel was

17 retained in early October and the filing on October 10, 2013 of the Petition for Immediate Return

18 of the Child and an Order to Show Cause requesting that this matter be set, that Petitioner's

19 request pursuant to his Hague application was finally set for hearing before this Court.

20 Thereafter, despite Respondent's attempts for further delay into 2014, this Court, in compliance

21 with Article 11 of the Convention on the Civil Aspects of International Child Abduction, has

22 properly expedited these proceedings upon its receipt.

23

24

Larrategui vs. Laborde
2:13-cv-01175-JAM-EFB

Petitioner's Trial Brief
Page 5

1      "The International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. §§ 11601-

2  11610 (2000), which is a codification of the Hague Convention on the Civil Aspects of

3  International Child Abduction, opened for signature, Oct. 25, 1980, T.I.A.S. No. 11670, 1343

4  U.N.T.S. 89, 51 Fed. Reg. 10,493, 10,498 (app. B) (March 26, 1986) (hereinafter "Hague

5  Convention"). The Hague Convention was adopted by the signatory nations "to protect children

6  internationally from the harmful effects of their wrongful removal or retention and to establish

7  procedures to ensure their prompt return to the State of their habitual residence, as well as to

8  secure protection for rights of access."  [March v. Levine, 249 F.3d 462 (6th Cir., 2001)]

9      "Requiring a return remedy in cases like this one helps deter child abductions and

10  respects the Convention's purpose to prevent harms resulting from abductions. An abduction can

11  have devastating consequences for a child. "Some child psychologists believe that the trauma

12  children suffer from these abductions is one of the worst forms of child abuse." H.R.Rep. No.

13  103-390, p. 2 (1993), U.S.Code Cong & Admin.News 1993, pp. 2419, 2420. A child abducted by

14  one parent is separated from the second parent and the child's support system. Studies have

15  shown that separation by abduction can cause psychological problems ranging from depression

16  and acute stress disorder to posttraumatic stress disorder and identity-formation issues. See N.

17  Faulkner, Parental Child Abduction is Child Abuse (1999), http:// www.prevent-abuse-

18  now.com/unreport.htm (as visited May 13, 2010, and available in Clerk of Court's case file)."

19  [Abbott v. Abbott, 130 S. Ct. 1983, 176 L.Ed.2d 789 (2010)]

20      "In thinking about these problems, we acknowledge that courts in the abducted-from

21  country are as ready and able as we are to protect children. If return to a country, or to the

22  custody of a parent in that country, is dangerous, we can expect that country's courts to respond

23  accordingly."  [Cf. Nunez-Escudero v. Tice-Menley, 58 F.3d 374, 377 (8th Cir.1995)]

24

Larrategui vs. Laborde
2:13-cv-01175-JAM-EFB

Petitioner'sTrial Brief
Page 6

1    "Under the ICARA, a petitioner must establish by a preponderance of the evidence that

2    his children were wrongfully removed or retained in breach of his custody rights under the laws

3    of the Contracting State in which the children habitually resided before they were removed or

4    retained. Hague Convention, arts. 3, 12; 42 U.S.C. §11603(e)(1)(A). Once wrongful removal is

5    shown, the children must be returned. Hague Convention, art. 12. [March v. Levine, supra at

6    466]

7        "Pursuant to Article 19 of the Hague Convention and ICARA, 42 U.S.C. § 11601(b)(4),

8    the court's role in applying the Hague Convention is not to resolve the merits of any custody

9    issue. Rather, the court is to determine whether the child was removed or retained wrongfully

10   from the child's habitual residence." [Giampaolo v. Erneta, 390 F.Supp.2d 1269 (N.D. Ga.,

11   2004)]

12       It is the goal of the Convention to "deter parents from crossing borders in search of a

13   more sympathetic court." [Friedrich v. Friedrich (6th Circuit, 1996) 78 F.3d 1060, 1064]

14       Such is the case here.  Respondent does not dispute that she has been litigating the

15   custody issues involving S.C. with Petitioner *in Argentina* for past six (6) years.  Furthermore,

16   the certified findings and orders of the Argentina court (and not disputed by Respondent), is that

17   she raised her allegations as set forth in these proceedings before the Argentina court.  However,

18   she did not prevail and therefore seeks to forum shop here asking this Court to revisit the merits

19   of the custody issue.

20       D.    S.C. MUST BE RETURNED TO ARGENTINA

21       "Pursuant to Article 3 of the Hague Convention, removal is wrongful under the

22   Convention if:

23

24

1    a) it is in breach of the rights of custody attributed to a person . . . under the law of the

2    State in which the child was habitually resident immediately before the removal or

3    retention; and

4    b) at the time of the removal or retention those rights were actually exercised . . . or

5    would have been so exercised but for the removal or the retention.

6    In applying this provision, a court must ask four questions.

7         (1) When did the removal or retention at issue take place?

8         (2) Where was the child habitually resident immediately prior to the removal or

9         retention?

10        (3) Did the removal or retention breach the Petitioner's rights of custody under the

11        law of the habitual residence?

12        (4) Was the Petitioner exercising those rights at the time of the removal or

13        retention? (Mozes v. Mozes, 239 F.3d 1067, 1070 (9th Cir. 2001)).

14   Therefore, a Petitioner establishes the elements of wrongful removal or retention by

15   demonstrating by a preponderance of the evidence that:

16        (1) the habitual residence of the child immediately before the date of the allegedly

17        wrongful removal or retention was in the country to which return is sought;

18        (2) the removal or retention breached the Petitioner's custody rights under the law

19        of the child's habitual residence; ...." [Patrick v. Rivera-Lopez (D.P.R., 2013)

20   pages 11-13]

21        Petitioner has met his burden of proving wrongful retention; accordingly, the child

22   must be returned unless the Respondent can establish her defenses: i.e. Article 13(b), Article 13,

23   or Article 20 of the Hague Convention. However, these "exceptions" must be applied narrowly.

24

Larrategui vs. Laborde
2:13-cv-01175-JAM-EFB

Petitioner'sTrial Brief
Page 8

1  [Rydder v. Rydder, 49 F.3d 369, 372 (8th Cir. 1995); 42 U.S.C. Section 1160(a)(4)].

2  Yet, even if an exception is established, this Court still has the discretion to order the

3  return of a child if return would further the aims of the Hague Convention. [Miller v. Miller, 240

4  F.3d 392, 402 (4th Cir. 2001); England v. England, 234 F.3d 268, 270-71 (5th Cir. 2000)].

5  **1.    When did the removal or retention at issue take place?**

6  Respondent acknowledges that the Argentina court issued an order allowing her to travel

7  to the United States with S.C. *from December 13, 2012 until January 29, 2013.*  Despite

8  subsequent orders from Argentina to return the child, Respondent continues to retain S.C. in the

9  United States.  Therefore, the "retention" occurred as of January 29, 2013.

10  **2.    Where was the child habitually resident immediately prior to the**

11  **removal or retention?**

12  "The purpose of the Hague Convention is to "protect children internationally from the

13  harmful effects of their wrongful removal or retention and to establish procedures to ensure their

14  prompt return to the State of their habitual residence...." Hague Convention, Preamble. The

15  Convention seeks to "restore the pre-abduction status quo and to deter parents from crossing

16  borders in search of a more sympathetic court." Friedrich v. Friedrich, 78 F.3d 1060, 1064 (6th

17  Cir.1996) ("Friedrich II"). Additionally, according to the official commentary on the Hague

18  Convention, the Convention should be read to prevent a circumstance where "the child is taken

19  out of the family and social environment in which its life has developed." Elisa Perez-Vera,

20  Explanatory Report ¶ 12, in 3 Hague Conference on Private International Law, Acts and

21  Documents of the Fourteenth Session, Child Abduction 1069 (1982) ("Perez-Vera Report").3"

22  [Robert v. Tesson, 507 F.3d 981 (6th Cir., 2007)]

23

24

"The Perez-Vera Report describes "habitual residence" as "a well-established concept in the Hague Conference, which regards it as a question of pure fact, differing in that respect from domicile." Perez-Vera Report at ¶ 66. In seeking to understand this "well-established concept," id., we discover that although the term "habitual residence" appears throughout the various Hague Conventions,6 none of them defines it." [In re: the Application of, Mozes, 239 F.3d 1067, 1071 (9th Cir., 2001)]

"A child's habitual residence is the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a "degree of settled purpose" from the child's perspective" [Feder v. Evans-Feder, 63 F.3d 217, 224 (C.A.3 (Pa.), 1995)] "Under the Hague Convention, the relevant period of habitual residence is that span of time "immediately before" the date of the alleged wrongful retention. See Shalit v. Coppe, 182 F.3d 1124, 1127 (9th Cir.1999) (mandating that "removal or retention of a child is wrongful where `it is in breach of rights of custody attributed to a person ... under the law of the State in which the child was habitually resident immediately before the removal or retention'") (quoting Hague Convention art. 3(a)); Feder, 63 F.3d at 224 (concluding that "Australia was [the child's] habitual residence immediately prior to his retention [Page 1285] in the United States by [his mother]"); Friedrich II, 78 F.3d at 1064 (finding that "removal of a child from the country of its habitual residence is wrongful under the Hague Convention if a person in that country is, or would otherwise be, exercising custody rights to the child under that country's law at the moment of removal") (citing Hague Convention art. 3)." [Pesin v. Osorio Rodriguez, 77 F.Supp.2d 1277 (S.D. Fla., 1999)]

S.C. was born in Buenos Aires, Argentina. On December 13, 2012, pursuant to Argentina court authorization, Respondent brought S.C. to the United States for a visit. She was

Larrategui vs. Laborde
2:13-cv-01175-JAM-EFB

Petitioner'sTrial Brief
Page 10

to be returned to Argentina no later than January 29, 2013. Therefore, until wrongfully retained by Respondent in the United States, S.C. residence was, and always had been since birth, Argentina.

Furthermore, Argentina has issued a Declaration pursuant to Article 15 of the Hague Convention on the Civil Aspects of International Child Abduction declaring the habitual residence of S.C. to be Argentina.

"Under the ICARA, a petitioner must establish by a preponderance of the evidence that his children were wrongfully removed or retained in breach of his custody rights under the laws of the Contracting State in which the children habitually resided before they were removed or retained. Hague Convention, arts. 3, 12; 42 U.S.C. §11603(e)(1)(A). Once wrongful removal is shown, the children must be returned. Hague Convention, art. 12." [March v. Levine, 249 F.3d 462, 466 (6th Cir., 2001)]

Petitioner clearly establishes by a preponderance of the evidence that Argentina is the habitual residence of S.C. and that Respondent has wrongfully retained S.C. in the United States since January 29, 2013. The following is undisputed:

1.	S.C. was born and always lived in Argentina; even when Respondent left and relocated to the United States, S.C. remained with Petitioner in Argentina.

2.	Respondent acceded to Argentina's jurisdiction and litigated the custody issues of S.C. in Argentina for six (6) years.

3.	Argentina issued an order in September 2010 granting full custody of S.C. to Petitioner.

4.	In November 2012, Argentina issued an order granting Respondent *visitation* with S.C. to the United States from December 13, 2012 until January 29, 2013 only.

Larrategui vs. Laborde
2:13-cv-01175-JAM-EFB

Petitioner's Trial Brief
Page 11

1  Thereafter, S.C. has been wrongfully retained in the United States by Respondent despite

2  further orders from Argentina to return.

3      **3.**     **Did the removal or retention breach the Petitioner's rights of custody**

4      **under the law of the habitual residence?**

5  In September of 2010, the Argentina courts assumed jurisdiction over the custody and

6  visitation issues between the parties with regard to their minor child, S.C. In doing so, Argentina

7  issued an order granting full custody of S.C. to Petitioner. Respondent appeared and participated

8  in those proceedings by and through her attorney.

9  Argentina granted Respondent the authority to remove S.C. from Argentina on December

10  13, 2012 and return her no later than January 29, 2013. When Respondent failed to return S.C.

11  as of January 29, 2013, her retention of S.C. in the United States became wrongful and in

12  violation of orders issued from Argentina. Petitioner was granted full custody of S.C. in 2010.

13  He has been the primary parent and sole caregiver since 2007. His daughter hasn't seen him

14  since December 13, 2012. Respondent's wrongful retention of S.C. clearly breached Petitioner's

15  rights of full custody of S.C. granted to him by the Argentina court in September of 2010.

16      **4.**     **Was the Petitioner exercising those rights at the time of the removal**

17      **or retention?**

18  It is clearly undisputed that Petitioner was, in fact, exercising his custodial rights as of

19  December 13, 2012 when S.C. left with her mother (Respondent) for a visit in the United States.

20  Petitioner never relinquished those custodial rights, nor consented to the further retention of S.C.

21  in the United States when Respondent failed to return her to Argentina on January 29, 2013 as

22  ordered.

23

24

1    C.    PETITIONER HAS MET HIS BURDEN UNDER ICARA FOR THE RETURN

2          OF S.C.

3          The undisputed facts in this case satisfy Petitioner's burden to prove by the

4    preponderance of the evidence [in this case, because the facts are undisputed, it has been proven

5    by clear and convincing] that Respondent wrongfully retained S.C. in the United States as of

6    January 29, 2013 from her habitual residence of Argentina. [Mozes v. Mozes, 239 F.3d 1067,

7    1070 (9th Cir. 2001)]

8          As a result, absent Respondent meeting her burden with respect to her affirmative

9    defenses, S.C. *must* be returned to Argentina. [March v. Levine, 249 F.3d 462 (6th Cir., 2001)]

10   D.    RESPONDENT'S AFFIRMATIVE DEFENSES

11         Respondent has alleged four (4) affirmative defenses to the Petition:  (1) Article

12   13(b) of the Convention on the Civil Aspects of International Child Abduction;  (2)  Article 13 of

13   the Convention on the Civil Aspects of International Child Abduction;  (3)  Article 20 of the

14   Convention on the Civil Aspects of International Child Abduction;  and (4)  Petitioner not

15   entitled to Attorney Fees and costs.  Respondent's affirmative defenses and claims of exception

16   must be applied narrowly.  [Rydder v. Rydder, 49 F.3d 369, 372 (8th Cir. 1995); 42 U.S.C.

17   Section 1160(a)(4)]

18   1.    **Article 13(b) of The Convention on the Civil Aspects of International**

19         **Child Abduction**

20         Article 13(b) of The Convention on the Civil Aspects of International Child Abduction

21   provides that a court may deny the return of a child upon a showing that "there is a grave risk

22   that his or her return would expose the child to physical or psychological harm or otherwise

23   place the child in an intolerable situation."  However, Respondent's burden of proving this

24

exception is "clear and convincing" evidence. [Patrick v. Rivera-Lopez at page 12 (D.P.R., 2013)]

Respondent has submitted S.C. to numerous psychological evaluations without Petitioner's consent or input. It is undisputed that S.C. was born with a genetic disorder as diagnosed in Argentina: developmental dysphasia, expressive subtype, in neuro linguistic, psycho pedagogical and neurological pediatric treatment. Respondent further alleges that the "grave risk" that S.C. would be exposed to "physical or psychological harm or otherwise place the child in an intolerable situation" is that Argentina lacks the medical technology to properly diagnose S.C. [Although Dr. Amartino's statement/report dated September 12, 2013 confirms that it does not alter any of the treatment S.C. has received in Argentina], that S.C. lacks proper hygiene, that she is exhibiting sexualized behavior [making the assumption that Petitioner must be sexually abusing S.C.], that she should be further evaluated with regard to the autistic spectrum, that there are "questions relating" to her emotional safety with Petitioner, that she is "at risk" of possibly developing a Borderline Personality Disorder, and that the United States psychologist, Dr. Crawford, "recommended" that S.C. remain in the United States for further evaluation.

First, the allegations against Petitioner based upon Respondent's assumptions from S.C. drawing phallic symbols, etc. was submitted to the Argentina court in June 2012 when Respondent filed *in Argentina* the equivalent of a Request for Change of Custody. [Respondent's Amended [Verified] Answer and Counter Petition, pp. 17-18:14-5, Paragraphs 22 and 23]. Ironically, Respondent was not satisfied with the speed in which the Argentina courts were considering her request [whereas in these proceedings, Respondent has actively pursued every avenue to delay] or their decision. Therefore, she is attempting to "take a second bite of

Larrategui vs. Laborde
2:13-cv-01175-JAM-EFB

Petitioner'sTrial Brief
Page 14

the apple" and request that this Court second guess the Argentina court in hopes that the results will be more favorable to her. However, this a proceeding pursuant to the Hague Convention and any consideration of custody issues are prohibited. "Courts are not to engage in a custody determination, so "[i]t is not relevant ... who is the better parent in the long run, or whether [the absconding parent] had good reason to leave her home ... and terminate her marriage.". [Giampaolo v. Erneta, 390 F.Supp.2d 1269 (N.D. Ga., 2004); Núñez-Escudero v. Tice-Menly, 58 F.3d 374,377 (8th Cir. 1995)]

The text of Article 13(b) requires only that the harm be "physical or psychological," but context and application make it clear that the harm must be a great deal more than minimal. [Núñez-Escudero v. Tice-Menley, 58 F.3d 374, 377 (8th Cir. 1995); Patrick v. Rivera-Lopez, page 27 (D.P.R., 2013)]. Therefore, under Article 13(b), "grave" means a more than serious risk. [Danaipour v. McLarey, 286 F.3d 1, 14 (1st Cir. 2002)]. The situations that the United States contemplates would satisfy Article 13(b) include sending a child back to a "zone of war, famine or disease" as well as "cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection." [Friedrich v. Friedrich, 78 F.3d 1060, 1069 (6th Cir. 1996)]

Not only is Respondent's burden to prove Article 13(b) factor by "clear and convincing" evidence, but it is universally accepted that the "grave risk" defense is subject to a narrow interpretation. [Patrick v. Rivera-Lopez (D.P.R., 2013) at page 27]

The "difficult question is at precisely what level will return expose the child to a 'grave risk' of harm or place the child in an 'intolerable situation'? There is no clear answer . . . ," but it is imperative that a showing be made that the risk posed to the child is grave, not merely serious.

Larrategui vs. Laborde
2:13-cv-01175-JAM-EFB

Petitioner's Trial Brief
Page 15

[Simcox v. Simcox (6th Cir. 2007) 511 F.3d 594, 604, 607, italics omitted; see Danaipour v. McLarey (1st Cir. 2002) 286 F.3d 1, 14; see also Walsh v. Walsh (1st Cir. 2000) 221 F.3d 204, 218 ["the harm must be a great deal more than minimal"]].

In *Maurizio R. v. L.C.*, Court of Appeal began by reciting the basic rules of the Hague Convention, including that courts receiving Hague petitions cannot resolve the question of who, as between the parents, is best suited to have custody of the child. With a few narrow exceptions, the court *must* return the abducted child to its country of habitual residence so that the courts of *that* country can determine custody. If the petitioner shows a wrongful removal, Convention requires repatriation of the abducted child to its country of habitual residence in all but a few exceptional circumstances, which must be narrowly interpreted "lest they swallow the rule of return." Article 13(b) of the Hague Convention, provides that return of a child need not be ordered if "there is a grave risk that the child's return would expose [him] to physical or psychological harm or otherwise place [him] in an intolerable situation." (42 U.S.C. §11603 (e)(2)(A).) However, the "grave risk" defense is narrow, and must be established by clear and convincing evidence. [Maurizio R. v. L.C. (2011) 201 Cal.App.4th 616]

In analyzing the "grave risk of harm" exception, Courts must make a finding that (1) the courts of the country of habitual residence was incapable of or unwilling to adequately protect the child; and (2) there are no alternative remedies that could be implemented to avoid or minimize the risk of harm, if any, that would otherwise exist. [In re Marriage of Forrest and Eaddy (2006) 144 Cal.App.4th 1202]

This was further expressed and clarified by the *March* court finding that a grave risk of harm for the purposes of the Convention can exist in only two situations. First, there is a grave risk of harm when return of the child puts the child in imminent danger prior to the resolution of

Larrategui vs. Laborde
2:13-cv-01175-JAM-EFB

Petitioner's Trial Brief
Page 16

the custody dispute--e.g., returning the child to a zone of war, famine, or disease. Second, there is a grave risk of harm in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection. [March v. Levine, 249 F.3d 462]

The U.S. Department of State opined: "This provision was not intended to be used by defendants as a vehicle to litigate (or relitigate) the child's best interests. Only evidence directly establishing the existence of a grave risk that would expose the child to physical or emotional harm or otherwise place the child in an intolerable situation is material to the court's determination. The person opposing the child's return must show that the risk to the child is grave, not merely serious.

A review of deliberations on the Convention reveals that "intolerable situation" was not intended to encompass return to a home where money is in short supply, or where educational or other opportunities are more limited than in the requested State...." Public Notice 957, 51 Fed.Reg. 10494, 10510 (March 26, 1986).

The Article 13(b) defense "do[es] not authorize a court to exceed its Hague Convention function by making determinations, such as who is the better parent, that remain within the purview of the court with plenary jurisdiction over the question of custody. To view the defenses more broadly would frustrate the core purpose of the Hague Convention - to preserve the status quo and deter parents from seeking custody of their child through, in effect, forum shopping. See Perez-Vera Report, supra, ¶ 34." [Avendano v. Smith, 806 F. Supp. 2d 1149, 1168 (D.N.M., 2011)]

Respondent's burden is to prove by "clear and convincing" evidence that not only would return of S.C. place her in immediate "grave risk of harm" to her physically and/or emotionally,

Larrategui vs. Laborde
2:13-cv-01175-JAM-EFB

Petitioner'sTrial Brief
Page 17

*but also* that Argentina is incapable or unwilling to give S.C. adequate protection. Even if this Court were to accept all statements made by Respondent to be true, she cannot meet this burden as a matter of law:

1. Respondent alleges that Argentina does not have as advanced and sophisticated medical technology as the United States; referring to a test administered to S.C. in the United States *confirming* the presumed diagnosis made by the child's doctors in Argentina. More important, S.C.'s treating neuro-pediatrician, Dr. Amartino clearly indicates in his affidavit that it absolutely does not change the course of treatment that S.C. has been undergoing in Argentina.

2. Respondent alleges that she is not knowledgeable or has developed poor hygiene habits. *Clearly*, as a matter of law, such an allegation does not pose a "grave risk of harm" to S.C. if true. Not even a "serious" risk of harm. Respondent's allegation is to elicit a custody decision from this Court – which is improper.

3. Dr. Crawford [a psychologist Respondent brought the child to without Petitioner's knowledge, consent or input, for the sole purpose of forming her defense] would like to further evaluate S.C. for determination of where she is on the autistic spectrum. Again, a United States psychologist *would like to* further evaluate. She also proffers Dr. Crawford's evaluation for the purpose of asserting that S.C. is emotionally distressed. This evaluation was conducted in the United States after S.C. was removed from the family and friends and environment she was used to and content with. Petitioner suggests that the distress noted by Dr. Crawford is caused by S.C. being removed from the parent who solely cared for her for six (6) years. Again, as a matter of law, such a fact does not rise to "grave risk of harm" to the child.

Larrategui vs. Laborde
2:13-cv-01175-JAM-EFB

Petitioner's Trial Brief
Page 18

1    4.    Respondent speculates that because S.C. is drawing "phallic symbols" and

2    having what she determines is "inappropriate" conversations with Petitioner, that there must be

3    sexual abuse by Petitioner.  Respondent confirms by her own statements that she has no evidence

4    that S.C. has been sexually abused at all – let alone – by Petitioner.  In fact, Respondent tried this

5    tactic in 2011/2012 when she brought S.C. to various doctors and then petitioned the Argentina

6    Court in June 2012 for a change of custody based on these allegations.  The Argentina courts are

7    just not responding to S.C. as expediently as she wants – nor are they rendering favorable

8    decisions to her satisfaction.  This is a clear definition of "forum shopping" of which the

9    Convention is most targeting;  parents who abduct children to "shop" countries or courts they

10   believe would be more favorable.

11        The affidavits and numerous statements and documents from family, friends, doctors and

12   teachers, clearly confirm that S.C. has been extremely well cared for in Argentina.  She attends a

13   private school that focuses specifically upon her needs.  She has several doctors monitoring her

14   progress.  It is confirmed that Petitioner "frequently" brings S.C. to her doctors for review and

15   evaluation.

16        If anything – the "grave risk of harm" to S.C. occurred when she was wrongfully retained

17   by Respondent in the United States:  S.C. was enrolled in a special school to address her special

18   educational needs.  The school she had been attending with her friends for many years is well

19   versed with S.C. and her needs.  The school *specifically* did not have S.C. participate in the

20   afternoon sessions because they were taught in English and her communication issues make it

21   extremely stressful for her to be force to understand and speak English at this stage.  In fact,

22   there is concern that Respondent's actions may have regressed S.C.'s progress.  Furthermore, she

23

24

has been taken from the only home she has known, her primary custodial parent, her siblings, her family and her friends.

The mere fact that a Court does not find in favor of a party does not indicate that they are incapable or unwilling to adjudicate justice – or protect a child. If that were the case, then approximately one half of all cases [especially custody] would fall within the Article 13(b) exception.

None of Respondent's allegations submitted in support of her Article 13(b) defense arises to "grave risk of harm"; nor is there *any* evidence [let alone clear and convincing], that Argentina is incapable or unwilling to address the issues for protection of the minor child. To the contrary, the Argentina court in their Order of November 2013 in response to these allegation, states: "Upon the expiration of said term, the child's mother claimed that the maternal grandfather had had health problems, which prevented her to fulfill her contracted obligation of returning the child back to the Argentine Republic (see writing on page 101 of the above mentioned record). For said reason, on page 116 of this record, it was decided to serve notice upon her of a warning, so that in the term of 48 hours she would inform the exact date when the child would be restored (7/2713). Due to that warning of requirement to comply, she appeared on page 117, and she answered she would not restore her since the child was in a very grave health condition ( Feb. 13, 2013). A posteriori, the decision on page 124 of said record was given (Feb. 22, 2013) where the application of the fine warned about was left without effect. Then this request for provisional remedies, bearing the Number 12.203/2013, was initiated on March 6 of this year. ------------------------------------------------------------- Within this provisional remedies framework of the child custody, the process of which has not been completed or finished yet, with the background added up to this date, the plausibility of the right claimed

Larrategui vs. Laborde
2:13-cv-01175-JAM-EFB

Petitioner'sTrial Brief
Page 20

can't be taken as credited, since the psychological medical reports attached by the parties "prima facie" show the child's health state, but not the impossibility that the treatment she must undergo be made in our country." Respondent's Article 13(b) affirmative defense fails as a matter of law.

### 2. Article 13 of The Convention on the Civil Aspects of International Child Abduction

Article 13 asserts: "The judicial or administrative authority may also refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views. In considering the circumstances referred to in this Article, the judicial and administrative authorities shall take into account the information relating to the social background of the child provided by the Central Authority or other competent authority of the child's habitual residence."

Respondent's first and second verified affirmative defenses are directly. Respondent alleges, as part of the "grave risk of harm" that would befall S.C. should she return to Argentina is predicated upon her medical condition which, by Respondent's own allegations and "experts" state most likely places S.C. within the autistic spectrum; noting that although S.C. may be chronologically about to turn fourteen (14) years of age, her emotional and maturity level is that of approximately an eight (8) or (9) year old. Petitioner agrees with observation.

Therefore, if the alleged incapability or unwillingness of Argentina to address S.C.'s "special needs" that admittedly impact her maturity level, is asserted as a "grave risk of harm" for her return; then how can she be mature enough for this Court to take her "alleged" objection to returning to Argentina into consideration?!

Regardless, S.C. has clearly indicated that she *wants* to return home. The affidavits of family and friends, her facebook communications, her letter to her Father, her video to her

Larrategui vs. Laborde
2:13-cv-01175-JAM-EFB

Petitioner'sTrial Brief
Page 21

family; in all such communications, S.C. states she misses her home, her dog, her family and friends and wants to return home.

Respondent's second affirmative defense under Article 13 fails as a matter of law and upon the face of the pleadings themselves.

### 3. Article 20 of The Convention on the Civil Aspects of International Child Abduction

Article 20 provides: "The return of the child under the provisions of Article 12 may be refused if this would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms."

Respondent has the burden of proving an Article 20 exception by clear and convincing evidence. [42 U.S.C. § 11603(e)(2)(A)]

"This seldom-cited and somewhat obscure provision was adopted as a compromise between those countries that wanted a public policy exception in the Convention and those that did not.38 It was meant to be "restrictively interpreted and applied ... on the rare occasion that return of a child would utterly shock the conscience of the court or offend all notions of due process." [Hazbun Escaf v. Rodriquez, 200 F.Supp.2d 603 (E.D. Va., 2002)]

"There is little case law in the United States focusing on this provision. However, the State Department explains that "it should be emphasized that this exception, like the others, was intended to be restrictively interpreted and applied, and is not to be used, for example, as a vehicle for litigating custody on the merits or for passing judgment on the political system of the country from which the child was removed." Fed.Reg. at 10510. See also Elisa Perez-Vera, Explanatory Report: Hague Convention on Private International Law 426, 462 ¶ 118 (1981) ("[S]o as to be able to refuse to return a child on the basis of this article, it will be necessary to

Larrategui vs. Laborde
2:13-cv-01175-JAM-EFB

Petitioner's Trial Brief
Page 22

1     show that the fundamental principles of the requested State concerning the subject-matter of the

2     Convention do not permit it; it will not be sufficient to show merely that its return would be

3     incompatible, even manifestly incompatible, with these principles.")." [March v. Levine, 136

4     F.Supp.2d 831, 855 (M.D. Tenn., 2000)]

5          "As of 1997 the Article 20 defense had successfully been invoked only twice

6     internationally—in cases where the constitutionality of the Convention itself was challenged—

7     and not at all in the United States. See Report of the Third Special Commission Meeting to

8     Review the Operation of the Hague Convention on the Civil Aspects of International Child

9     Abduction (17-21 March 1997), Permanent Bureau of the Hague Conference on Private

10     International Law ¶ 78 (1997)." [Hazbun Escaf v. Rodriquez, supra at footnote 36]

11          "Article 20 does not contemplate that courts applying the provision must compare the due

12     process safeguards provided in the petitioner's country with those provided in the respondent's

13     country or with some ideal notion of due process. See State Department Legal Analysis at

14     10,511" [Hazbun Escaf v. Rodriquez, supra at footnote 40]

15          The exception is "not to be used, for example, as a vehicle for litigating custody on the

16     merits or for passing judgment on the political system of the country from which the child was

17     removed." [Souratgar v. Fair at page 28, (S.D.N.Y., 2012)]

18          Respondent was born in Argentina; and resided there until 2007. She has admittedly

19     litigated this case before the Argentina courts for six (6) years. There is absolutely no evidence

20     [let along clear and convincing] that Respondent has presented- or *can* present-to establish that

21     the Argentina judicial system fails to protect human rights and fundamental freedoms.

22

23

24

## III.

## ATTORNEY FEES

"Any court ordering the return of a child pursuant to an action brought under section 4 shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, foster home or other care during the course of proceedings in the action, and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate." [United States Code, Title 42 §11607(b)(3)]

The Argentine government is unique in that citizens who must pursue Hague actions in other countries for the return of abducted Argentina children have access to "borrow" the immediate need of funds for legal costs, fees, and travel expenses. However, these funds *must* be returned – to replenish the fund for other similar cases.

Petitioner was not "given" or "gifted" these funds by the Argentina government. It was a loan that he is required to repay. Especially since *Respondent* removed this matter to Federal Court wherein the District Attorney could no longer pursue the matter on behalf of the state – thus forcing Petitioner to retain private counsel.

Accordingly, Petitioner is entitled to recover his court costs, legal fees, and transportation costs related to the return of S.C. to Argentina should this Court issue an order of return.

## IV.

## THE UCCJEA

"(a) A court of this state shall treat a foreign country as if it were a state of the United States for the purpose of applying this chapter and Chapter 2 (commencing with Section 3421).

Larrategui vs. Laborde
2:13-cv-01175-JAM-EFB

Petitioner'sTrial Brief
Page 24

1          (b) Except as otherwise provided in subdivision (c), a child custody determination made

2    in a foreign country under factual circumstances in substantial conformity with the jurisdictional

3    standards of this part must be recognized and enforced under Chapter 3 (commencing with

4    Section 3441).

5          (c) A court of this state need not apply this part if the child custody law of a foreign

6    country violates fundamental principles of human rights. (Rep & Ad Stats 1999, C867)

7    [California Family Code §3405]

8          As a result, custody orders issued by foreign courts are asserted the same as "states" in

9    California Family Code §§3443 and 3453.

10         California Family Code §3443 provides: "(a) A court of this state shall recognize and

11   enforce a child custody determination of a court of another state if the latter court exercised

12   jurisdiction in substantial conformity with this part or the determination was made under factual

13   circumstances meeting the jurisdictional standards of this part and the determination has not been

14   modified in accordance with this part.

15   (b) A court of this state may utilize any remedy available under other laws of this state to enforce

16   a child custody determination made by a court of another state. The remedies provided in this

17   chapter are cumulative and do not affect the availability of other remedies to enforce a child

18   custody determination."

19         California Family Code §3453 provides: "A court of this state shall accord full faith and

20   credit to an order issued by another state, and consistent with this part, enforce a child custody

21   determination by a court of another state unless the order has been vacated, stayed, or modified

22   by a court having jurisdiction to do so under Chapter 2 (commencing with [Fam. Code §3421])."

23

24

Larrategui vs. Laborde
2:13-cv-01175-JAM-EFB

Petitioner's Trial Brief
Page 25

Argentina issued a custody order granting full custody of S.C. to Petitioner in September

2     2010.  Respondent participated in those proceedings, as well as the continuing litigation in this

3     case through the Argentina courts.

4        "The UCCJEA takes a strict "first in time" approach to jurisdiction. Basically, subject to

5     exceptions not applicable here (Fam. Code, §§3422, subd. (a)(1)-(2), 3423, subds. (a) & (b),

6     3450, subd. (a)(1)-(2)), once the court of an appropriate state (Fam. Code, §3421, subd. (a)) has

7     made a "child custody determination," that court obtains "exclusive, continuing jurisdiction . . . ."

8     (Fam. Code, §3422, subd. (a).) The court of another state:  (a) Cannot modify the child custody

9     determination (Fam. Code, §§3421, subd. (b), 3422, subd. (a), 3423, 3446, subd. (b));  (b) Must

10    enforce the child custody determination (Fam. Code, §§3443, 3445, 3446, 3448, 3453); and

11    (c) "[M]ay issue a temporary order enforcing either:  "(1) A visitation schedule made by a court

12    of another state.  "(2) The visitation provisions of a child custody determination of another state

13    that does not provide for a specific visitation schedule." (Fam. Code, §3444, subd. (a).)  A

14    "'[c]hild custody determination'" is defined as "a judgment, decree, or other order of a court

15    providing for the legal custody, physical custody, or visitation with respect to a child." (Fam.

16    Code, §3402, subd. (c).)  [In re Marriage of Paillier (2006) 144 Cal.App.4th 461, 470]

17       "For purposes of the Act's definitional and jurisdictional provisions (Fam. Code, §§3400-

18    3430), a court of this state must "treat a foreign country as if it were a state of the United States .

19    . . ." (Fam. Code, §3405, subd. (a).) Moreover, "a child custody determination made in a foreign

20    country under factual circumstances in substantial conformity with the jurisdictional standards of

21    [the Act] must be . . . enforced" under the Act's enforcement provisions (Fam. Code, §§3441-

22    3457). (Fam. Code, §3405, subd. (b).) The only exception is that "[a] court of this state need not

23    apply [the UCCJEA] if the child custody law of [the] foreign country violates fundamental

24

| | |
|---|---|
| 1 | principles of human rights." (Fam. Code, §3405, subd. (c).)" [In Re Marriage of Paillier, supra at |
| 2 | p. 470] |
| 3 | There is absolutely no dispute or doubt that Argentina was the first [and only jurisdiction] |
| 4 | to issue custody orders between these parties with respect to their child.  There is no evidence |
| 5 | that Argentina's judicial system "violates fundamental principles of human rights." |
| 6 | When Respondent first wrongfully retained S.C. in the United States on January 29, |
| 7 | 2013, Petitioner could have merely registered the Argentina order in California and pursue |
| 8 | enforcement thereof.  [California Family Code §3445]  Unfortunately, because the report of the |
| 9 | abduction came through the Department of Children Services in Washington D.C. from the |
| 10 | Central Authority of Argentina, it was left to the discretion of the District Attorney of San |
| 11 | Joaquin County to choose the remedy for expedient return of S.C. to her home.  The District |
| 12 | Attorney obviously opted for and proceeded with a Petition for Return of the Child pursuant to |
| 13 | the Hague Convention. |
| 14 | However, that does not eliminate the fact that California law under the UCCJEA requires |
| 15 | that the United States grant full faith and credit to the orders from Argentina. |
| 16 | |
| 17 | **V.** |
| 18 | **CONCLUSION** |
| 19 | Argentina has issued valid custody and orders for the return of S.C. to Argentina. |
| 20 | Petitioner could have availed himself to registering and enforcing those orders pursuant to the |
| 21 | UCCJEA.  However, the District Attorney was in control of the legal procedures at the initial |
| 22 | stages of this case – and opted to pursue the return of S.C. by filing a Petition for return under the |
| 23 | Hague Convention.  However, that does not cancel the law of the state; i.e. the Hague is not to |
| 24 | |

Larrategui vs. Laborde
2:13-cv-01175-JAM-EFB

Petitioner's Trial Brief
Page 27

contradict nor elicit inconsistent results from the laws dictated by the UCCJEA. The UCCJEA still applies.

Argentina is indisputably the habitual residence of S.C. Petitioner was granted legal full custody of S.C. by the Argentina courts in 2010. Respondent wrongfully retained S.C. in the United States as of January 29, 2013 – failing to return her to Argentina as ordered by the court. Respondent's "exceptions" or "defenses" all fail from her recitation of the facts: S.C.'s medical condition and special needs do not arise to a "grave risk of harm" to S.C. as a matter of law. Nor does "mere speculation" and "false allegations" of sexual abuse. Furthermore, Respondent already brought those issues to the court of proper jurisdiction – Argentina. She didn't approve of their decision and now seeks this court to re-litigate the custody issues – which it cannot.

Respondent's second affirmative defense under Article 13 is skeptical at best. Especially in light of the fact that on the one hand Respondent states that the child's special needs that places her mentally and emotionally far younger than her chronological age is not being treated appropriately in Argentina [her Article 13(b) defense]; and then, on the other hand, states that the child objects to returning to Argentina and that she is mature enough for the court to consider her objection [her Article 13 defense]. The affirmative defenses not only fail in and of themselves, but they are wholly inconsistent and contradictory – they cancel each other out.

Respondent's final defense under Article 20 is ludicrous. Argentina does not violate the fundamentals of human rights. They have a judicial system in place not too dissimilar to the United States.

This is a clear case of abduction. Respondent decided to relocate to the United States with her new husband and was dissatisfied that the Argentina courts would not allow her to move away with the parties' minor child. This is not unlike California "move away" cases.

Larrategui vs. Laborde
2:13-cv-01175-JAM-EFB

Petitioner's Trial Brief
Page 28

Respondent took the law into her own hands and decided to keep S.C. in direct violation of orders issued by Argentina wherein she was legally represented. She now comes to this court and seeks a re-litigation of the custody issues and her "move away" request. Any custody issues in this matter *must* be referred back to Argentina – they have the proper jurisdiction – not California.

Accordingly, Petitioner respectfully requests that this Court order an immediate return of the minor child to Petitioner's custody and award Petitioner all legal costs and fees, and transportation costs incurred as a result of Respondent's wrongful and egregious conduct.

Dated: 11/23/2013

Respectfully submitted,
*LAW OFFICES OF B J FADEM & ASSOCIATES, APC*

B J Fadem, Esq.
Attorney for Petitioner

Larrategui vs. Laborde
2:13-cv-01175-JAM-EFB

Petitioner'sTrial Brief
Page 29