1 | B J Fadem Esq.    SBN: 118819*
*Certified Family Law Specialist - State Board of Specialization
2 | Ron B. Nerio, Esq, SBN: 251228
Magdalena A. LaBranch, Esq.  SBN: 262783
3 | Corrine Gaxiola, Esq.   SBN: 270060
LAW OFFICES OF B J FADEM & ASSOCIATES, APC
4 | 111 N. Market Street,  Suite 910
San Jose, CA  95113
5 | Telephone: 408-280-1220
Fax: 408-971-9940
6 | bjfadem@fademlaw.com
Attorneys For Petitioner
7 | DANIEL CARLOS CHIRAMBERRO LARRATEGUI

8

9 |                    UNITED STATES DISTRICT COURT

10 |                   EASTERN DISTRICT OF CALIFORNIA

11 | DANIEL CARLOS CHIRAMBERRO            Case No.: 2:13-cv-01175-JAM-EFB
LARRATEGUI,
12 |           Petitioner,                PETITIONER'S PROPOSED FINDINGS OF
                                          FACT AND CONCLUSIONS OF LAW
13 | vs.
                                          Trial Date:   12/02 – 12/05/2013
14 | VALERIA EGUIGUREN LABORDE,           Courtroom:  6
           Respondent.                    Judge:    Hon. John A. Mendez
15

16

17 |                               I.

18 |                      **FINDINGS OF FACT**

19 | A.    THE PARTIES' RELATIONSHIP

20 | 1.    Petitioner and Respondent were both born in Argentina.

21 | 2.    They met and began dating in 1996 and began cohabitating in 1997.

22 | 3.    The minor child, S.C. was born in Argentina on December 12, 1999.

23 | 4.    In or about 2002, the parties separated.

24

5.     In or about 2005, the parties entered into an agreement wherein the minor child, S.C. lived approximately equally with both Petitioner and Respondent.

6.     In 2007, Respondent relocated to the United States. She first resided in Boston and eventually married her current husband and resides in California. Respondent and her current husband have a son, approximately three and a half (3 ½ ) years old.

7.     When Respondent relocated to the United States, S.C. was left in the care of Petitioner in Argentina.

B.     S.C. SPECIAL NEEDS

1.     S.C. was born with a genetic anomaly that has, among other issues, cause her delay in speech and language, decreased cognitive ability, and social issues. Although chronologically fourteen (14) years of age, she is emotionally and mentally much younger.

2.     As a result of S.C.'s medical condition, she has special needs with regard to medical, emotional and educational support.

C.     S.C.'S CARE IN ARGENTINA

1.     Since the age of approximately 2 or 3, S.C. has been receiving a number of services:

a.     Medical:     Through Hospital Aleman in Argentina, S.C. has been under the care of numerous physicians and mental health professions, including, but not limited to Dr. Hernan Amartino, Dr. M. Caroline Gonzalez, Dr. Virginia Rogers, Dr. Alejandra Mignagni, Dra Luciana Revora, Dra Sara Cohen, Dra Agustina Chanfreau, Lic. Estela Pertierra, and Lic Noelia Menarique.

Larrategui vs. Laborde
2:13-cv-01175-JAM-EFB

Petitioner's Proposed Findings of Fact & Conclusions of Law
Page 2

b.    Educational:    S.C. has been attending "Colegio Bilingue Armonia, a certified private school that specifically integrates students with special needs such as S.C.'s since 2007. The teachers and staff at Armonia are specifically trained for "special needs" children. At Armonia, S.C. has received personal attention from an integrator teacher. Her school counselor, Barbara Gelbaum has been providing S.C. with counseling services at school since 2007. S.C. further has the assistance of a private tutor (Noelia Mena Rique) for two (2) hours per week. Furthermore, the school regularly meets with S.C.'s medical team to assimilate her medical and educational needs in order to adequately serve her needs.

2.    S.C.'s entire family [with the exception of her Mother, Step-father, and half brother] reside in Argentina; maternal and paternal.    S.C. further has two (2) half siblings of adult age residing in Argentina.

3.    S.C. has a "nanny" or caregiver to care for S.C. while Petitioner is at work and S.C. is not in school. The caregiver is a psychology student.

D.    <u>ARGENTINA COURTS</u>

1.    Although not identical, the Argentina judicial system is not unlike that of the United States.

2.    Respondent and Petitioner have been legally represented throughout the litigation in Argentina. In addition, the child, S.C. has been legally represented by the Counsel for Minors.

3.    The custody proceedings were initiated in Argentina in approximately 2007.

Larrategui vs. Laborde
2:13-cv-01175-JAM-EFB

Petitioner's Proposed Findings of Fact & Conclusions of Law
Page 3

1    4.    In 2010, the Argentina court issued an order granting full custody of S.C. to

2  Petitioner.

3    5.    In November 2012, it was agreed and subsequently ordered by the Argentine

4  court that Respondent may bring S.C. to the United States for a visit from December 13, 2012

5  until January 29, 2013.

6

7    6.    Respondent failed to return S.C. to Argentina by January 29, 2013; first advising

8  the court that her father was gravely ill and therefore, her mother could not transport S.C. back to

9  Argentina and finally, after being ordered to return S.C. no later than 48 hours prior to the start

10  of school, that she was not going return S.C. to Argentina.

11    7.    The Argentina appellate court issued an order on November 14, 2013,

12  acknowledging Respondent's request regarding custody, received the psychological reports and

13  evaluations presented during the Hague proceedings, and:

14

15    a.    Denied Respondent's "provisional remedy" request as being inappropriate

16  for a request for change of custody;

17

18    b.    That the issue of custody is still pending before the Argentine court;

19    c.    That upon review of the documents submitted by Respondent there is no

20  reason why S.C.'s treatment cannot be provided in Argentina; and

21    d.    Pursuant The Hague Convention, Respondent has wrongfully retained

22  S.C. in the United States and is to immediately return her to Argentina.

23

24

Larrategui vs. Laborde
2:13-cv-01175-JAM-EFB

Petitioner's Proposed Findings of Fact & Conclusions of Law
Page 4

E.    SERVICES OBTAINED BY RESPONDENT FOR S.C. IN CALIFORNIA

8.    Respondent retained Dr. Joan Crawford for evaluation of S.C. without knowledge, consent, or input from Petitioner.

9.    Respondent retained Dr. Bernal and Kaiser Permanente for evaluation of S.C. without knowledge, consent or input from Petitioner.

10.   Respondent's experts, Dr. Crawford and Dr. Bernal, testified that the additional information from Petitioner and her medical and educational providers in Argentina would have greatly assisted their evaluation.

11.   S.C. is currently attending a public school of the County of San Joaquin.  The school's special education program is unable to meet S.C.'s needs.

F.    RETURN OF S.C. TO ARGENTINA

12.   Argentina is capable of meeting S.C.'s medical needs.

13.   Argentina is capable of meeting S.C.'s educational needs.

14.   S.C. has family, friends, and caregivers awaiting her return to Argentina to support her.

Larrategui vs. Laborde
2:13-cv-01175-JAM-EFB

Petitioner's Proposed Findings of Fact & Conclusions of Law
Page 5

## II.

## CONCLUSIONS OF LAW

A.    GENERAL PRINCIPLES

"The International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. §§ 11601-11610 (2000), which is a codification of the Hague Convention on the Civil Aspects of International Child Abduction, opened for signature, Oct. 25, 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 89, 51 Fed. Reg. 10,493, 10,498 (app. B) (March 26, 1986) (hereinafter "Hague Convention"). The Hague Convention was adopted by the signatory nations "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access."  [March v. Levine, 249 F.3d 462 (6th Cir., 2001)]

"Requiring a return remedy in cases like this one helps deter child abductions and respects the Convention's purpose to prevent harms resulting from abductions. An abduction can have devastating consequences for a child. "Some child psychologists believe that the trauma children suffer from these abductions is one of the worst forms of child abuse." H.R.Rep. No. 103-390, p. 2 (1993), U.S.Code Cong & Admin.News 1993, pp. 2419, 2420. A child abducted by one parent is separated from the second parent and the child's support system. Studies have shown that separation by abduction can cause psychological problems ranging from depression and acute stress disorder to posttraumatic stress disorder and identity-formation issues. See N. Faulkner, Parental Child Abduction is Child Abuse (1999), http:// www.prevent-abuse-now.com/unreport.htm (as visited May 13, 2010, and available in Clerk of Court's case file)." [Abbott v. Abbott, 130 S. Ct. 1983, 176 L.Ed.2d 789 (2010)]

Larrategui vs. Laborde
2:13-cv-01175-JAM-EFB

Petitioner's Proposed Findings of Fact & Conclusions of Law
Page 6

1      A Petition for Return pursuant to the Hague Convention must establish by the

2  preponderance of the evidence that:  "(1) the habitual residence of the child immediately before

3  the date of the alleged wrongful retention was in a foreign country; (2) the retention is in breach

4  of custody rights under the foreign country's law; and (3) the petitioner was exercising custody

5  rights at the time of the alleged wrongful retention. [42 U.S.C. § 11603(e)(1)(A)]

6      Once established, the child must be immediately returned to the country of their habitual

7  residence unless Respondent has proven by "clear and convincing" evidence that returning the

8  child would expose her to "grave risk of harm" physically or psychologically.  [42 U.S.C. §

9  11601(a)(4)]

10

11      "...[U]nder Article 13(b), "grave" means a more than serious risk. [Danaipour v.

12  McLarey, 286 F.3d 1, 14 (1st Cir. 2002)]. The situations that the United States contemplates

13  would satisfy Article 13(b) include sending a child back to a "zone of war, famine or disease" as

14  well as "cases of serious abuse or neglect, or extraordinary emotional dependence, when the

15  court in the country of habitual residence, for whatever reason, may be incapable or unwilling to

16  give the child adequate protection." [Friedrich v. Friedrich, 78 F.3d 1060, 1069 (6th Cir. 1996)]

17      Not only is Respondent's burden to prove Article 13(b) factor by "clear and convincing"

18  evidence, but it is universally accepted that the "grave risk" defense is subject to a narrow

19  interpretation.  [Patrick v. Rivera-Lopez (D.P.R., 2013) at page 27]

20

21      The "difficult question is at precisely what level will return expose the child to a 'grave

22  risk' of harm or place the child in an 'intolerable situation'? There is no clear answer . . . ," but it

23  is imperative that a showing be made that the risk posed to the child is grave, not merely serious.

24  [Simcox v. Simcox (6th Cir. 2007) 511 F.3d 594, 604, 607, italics omitted; see Danaipour v.

McLarey (1st Cir. 2002) 286 F.3d 1, 14; see also Walsh v. Walsh (1st Cir. 2000) 221 F.3d 204,

218 ["the harm must be a great deal more than minimal"]].

Even if the evidence supports a conclusion that returning a child to their country of habitual residence would create some risk of harm, the court cannot deny a petition for return without also finding that (1) the courts of the country of habitual residence are incapable of or unwilling to adequately protect the child; and (2) there are no alternative remedies that it could implement to avoid or minimize the risk of harm that would otherwise exist and allow the child's return to the country of habitual residence.  [In re Marriage of Forrest and Eaddy (2006) 144 Cal.App.4th 1202]

"The exception for "grave risk of harm" sets a high standard for a court's refusal to return children. As the Sixth Circuit has observed, such a risk can exist in only two circumstances: when return of the child would put the child in imminent danger prior to resolution of the custody dispute (as from war, famine, or disease), or when, in cases of serious abuse or neglect, the country of habitual residence may be incapable or unwilling to give the child adequate protection. Friedrich II, 78 F.3d at 1068, 1069, (quoting U.S. Dept. of State, Public Notice 957, 51 FR 10494, 10510 (March 26, 1986)). Friedrich II cautioned that "[t]he exception for grave harm to the child is not license for a court in the abducted-to country to speculate on where the child would be happiest." Id. at 1068." [In re Koc, 181 F.Supp.2d 136 (E.D.N.Y., 2001)]

The Article 13(b) defense "do[es] not authorize a court to exceed its Hague Convention function by making determinations, such as who is the better parent, that remain within the purview of the court with plenary jurisdiction over the question of custody.  To view the defenses more broadly would frustrate the core purpose of the Hague Convention - to preserve

Larrategui vs. Laborde
2:13-cv-01175-JAM-EFB

Petitioner's Proposed Findings of Fact & Conclusions of Law
Page 8

the status quo and deter parents from seeking custody of their child through, in effect, forum shopping. See Perez-Vera Report, supra, ¶ 34." [Avendano v. Smith, 806 F. Supp. 2d 1149, 1168 (D.N.M., 2011)]

"A review of deliberations on the Convention reveals that "intolerable situation" was not intended to encompass return to a home where money is in short supply, or where educational or other opportunities are more limited than in the requested State...." Public Notice 957, 51 Fed.Reg. 10494, 10510 (March 26, 1986).

"Thus, as the court in Blondin noted:     At one end of the spectrum are those situations where repatriation might cause inconvenience or hardship, eliminate certain educational or economic opportunities, or not comport with the child's preferences; at the other end of the spectrum are those situations where the child faces a real risk of being hurt, physically or psychologically, as a result of repatriation. The former do not constitute a grave risk of harm under Article 13(b); the latter do. (Blondin v. Dubois, 238 F.3d at 162)."     [In re Koc, 181 F.Supp.2d 136 (E.D.N.Y., 2001)]

B.     PETITIONER'S PRIMA FACIE CASE

Without objection, Argentina is clearly the country of habitual residence of S.C. Furthermore, Respondent, contrary to orders issued by the Argentine court, wrongfully retained S.C. in the United States as of January 29, 2013.  Accordingly, Petitioner has established a prima facia case that Respondent has wrongfully retained S.C. in the United States.

Larrategui vs. Laborde
2:13-cv-01175-JAM-EFB

Petitioner's Proposed Findings of Fact & Conclusions of Law
Page 9

C.    ARTICLE 13(B): "GRAVE RISK OF HARM"

Respondent's evidence of potentially biased evaluations from California professionals does not establish "clear and convincing" evidence that S.C.'s return to Argentina would result in "grave risk of harm" to her psychologically or physically.

Respondent failed to provide any evidence establishing that S.C. was physically or sexually abused or severely neglected by Petitioner in Argentina.

Even if Respondent's experts [Dr. Crawford and Dr. Bernal] are correct in their opinions and recommendations, Respondent has not provided evidence that Argentina could not or would not provide the necessary treatment to S.C.

Regardless, the comparison of whether one country's educational or medical opportunities are better than the other, do not constitute a "grave risk of harm" as contemplated by the drafters of the Hague Treaty, nor within the purviews of 42 U.S.C. §11603.  [In re Koc, 181 F.Supp.2d 136 (E.D.N.Y., 2001);  Public Notice 957, 51 Fed.Reg. 10494, 10510 (March 26, 1986)]

Accordingly, Respondent has failed to satisfy her burden by clear and convincing evidence that S.C. should not be returned to Argentina pursuant to Article 13(b) of The Hague Convention.

Larrategui vs. Laborde
2:13-cv-01175-JAM-EFB

Petitioner's Proposed Findings of Fact & Conclusions of Law
Page 10

D.    THE ARGENTINA ORDERS

Respondent has not provided convincing evidence that the court in Argentina has acted in a manner that would "… utterly shock the conscience of the court or offend all notions of due process. [51 Fed. Reg. 10,510.]

This matter has been litigated by the parties for over six (6) years in the Argentina courts. Both parties have been represented throughout those proceedings. Argentina has issued custody orders, orders for the return of the child, and a Declaration pursuant to Article 15 of The Hague Convention.

Accordingly, the Hague proceedings cannot disregard the UCCJEA, nor the doctrine of comity.

"[f]ull faith and credit shall be accorded by the courts of the States and the courts of the United States to the judgment of any other such court ordering or denying the return of a child, pursuant to the Convention, in an action brought under this chapter." 42 U.S.C. §11603 (G)]

Under the UCCJEA and Hague, California courts must enforce conforming foreign custody orders and may enforce visitation orders. Pursuant to the UCCJEA, Argentina has issued custody orders in this case [and has retained jurisdiction over the custody issues for over six (6) years. Argentina, therefore has exclusive and continuing jurisdiction with regard to custody. [California Family Code Section 3444; In re Marriage of Paillier (2006) 144 Cal.App.4th 461]

The UCCJEA contains provisions that clarify when foreign custody determinations

Larrategui vs. Laborde
2:13-cv-01175-JAM-EFB

Petitioner's Proposed Findings of Fact & Conclusions of Law
Page 11

(from Hague and non-Hague countries) are entitled to enforcement and when courts in the United States must defer to the custody jurisdiction of a foreign court." [The Uniform Child-Custody Jurisdiction and Enforcement Act, U.S. Department of Justice Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention, Patricia M. Hoff]

"The UCCJEA requires State courts to recognize and enforce custody determinations made by foreign courts under factual circumstances that substantially conform with the UCCJEA's jurisdictional standards and to defer to foreign courts as if they were State courts, unless child-custody law of the foreign country violates fundamental principles of human rights; i.e. to enforce the foreign order and return the child would "…utterly shock the conscience of the court or offend all notions of due process." [51 Fed. Reg. 10,510.]

E.    CONCLUSION

The Respondent wrongfully retained S.C. from her country of habitual residence, Argentina.  Respondent has failed to satisfy her burden of proof by "clear and convincing" evidence that returning S.C. to Argentina would expose her to a "grave risk of harm" or that Argentina could not or would not prove the necessary treatment for S.C.  Argentina has issued custody orders, as well as orders for the immediate return of the child.  The United States must enforce Argentina's orders.