UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

DANIEL CARLOS CHIRAMBERRO          No.   2:13-cv-01175 JAM-EFB
LARRATEGUI,

            Petitioner,
                                   **ORDER GRANTING PETITION FOR
     v.                            RETURN OF CHILD WITH
                                   UNDERTAKINGS**
VALERIA EGUIGUREN LABORDE,

            Respondent.

     This matter is before the Court on Petitioner Daniel Carlos
Chiramberro Larrategui's ("Petitioner") Petition for Return of
Child (Doc. #9).  Respondent Valeria Eguiguren Laborde
("Respondent") opposed Petitioner's motion (Doc. #19) and
Petitioner replied (Doc. #21).  For the reasons set forth below,
the Court grants the Petition for Return of Child with
undertakings.

     Beginning on December 2, 2013, and through December 5,
2013, the Court held a bench trial and heard testimony from
Petitioner; Respondent; Ramon Valezquez; Ricardo Arrendondo,
Deputy Consul General at the Consulate General of the Argentine
Republic in Los Angeles; C. Joanne Crawford, Ph.D ("Dr.
Crawford"); Maria-Pilar Bernal-Estevez, M.D.("Dr. Bernal");

Arghya Chakraverty; Susana Deol; and Alicia Groba.   Numerous

exhibits, including affidavits from percipient witnesses, were

also submitted by the parties for the Court's consideration.

Following the bench trial, the parties submitted post-trial

supplemental briefing on December 16, 2013 (Doc. ##50-54).   For

the reasons set forth below and upon review of the petition,

testimony, exhibits, briefing, and all arguments made, the Court

now enters its Findings of Fact and Conclusions of Law pursuant

to Federal Rule of Civil Procedure 52(a).

                        I.   FINDINGS OF FACT

    1.    Petitioner and Respondent were both born in Argentina.

    2.    They met and began dating in 1996 and began

cohabitating in 1997.

    3.    S.C. was born in Argentina in December 1999.

    4.    Petitioner is the father of S.C.

    5.    Respondent is the mother of S.C.

    6.    In or about 2002, Petitioner and Respondent separated

when S.C. was two years old.

    7.    When the parties separated, S.C. resided primarily

with Respondent, but Petitioner frequently spent time with S.C.

    8.    When S.C. was about two to three years old, she was

diagnosed with Developmental Dysphasia.

    9.    In Argentina, through the Hospital Aleman, S.C. was

under the care of numerous physicians and mental health

professionals, including Dr. Hernan Amartino ("Dr. Amartino").

    10.   In Argentina, S.C. was attending Colegio Bilingue

Armonia.

11.   Armonia is a school that integrates students with Special Education Needs

12.   In 2006, Respondent began discussing with Petitioner the possibility of S.C. relocating to the United States in the spring of 2007.

13.   In 2007, Respondent moved to the United States from Argentina.  She is currently married and has a son of approximately three and a half years old.

14.   When Respondent left to the United States, Petitioner cared for S.C.

15.   Child custody proceedings occurred in Argentina beginning in 2007.

16.   In 2010, an Argentina court granted Petitioner full custody of S.C.

17.   Beginning in 2009, S.C. began experiencing emotional outbursts.

18.   In November 2012, through an Argentina court order, Respondent was allowed to bring S.C. to the United States from December 13, 2012, until January 29, 2013.[1]

19.   S.C. did not return to Argentina by January 29, 2013.

20.   S.C. is currently enrolled at Monte Vista Middle School, a public school in San Joaquin County.

_____

[1] Both parties have submitted substantial evidence regarding the Argentina court system and earlier custody proceedings.  The evidence deals directly with custody and visitation issues, which Respondent has not fully litigated in Argentina, and therefore, have little bearing on the issues before this Court. Accordingly, the Court makes no further findings of facts or conclusions of law regarding the Argentina Court system or the custody proceedings.

1    21.  Argyua Chakraverty ("Mr. Chakraverty") is S.C.'s

2  English Language Development ("ELD") teacher at Monte Vista

3  Middle School.

4    22.  Suzanna Deol ("Ms. Deol") is the school counselor at

5  Monte Vista Middle School.

6    23.  In the United States, S.C. was evaluated by Dr.

7  Crawford in 2012 and then again in 2013.

8    24.  Dr. Crawford determined that S.C. "runs the risk of

9  psychotic breakdown, and if not supported adequately is in

10  danger of developing a Borderline Personality Disorder."

11    25.  A medical group, including Dr. Bernal, from Kaiser

12  Permanente Spectrum Disorder Center evaluated S.C. on April 24,

13  2013.

14    26.  The Kaiser Permanente medical group diagnosed S.C.

15  with Borderline Intellectual Functioning and a mood disorder.

16    27.  S.C. is currently attending weekly therapy sessions.

17

18                    II.   OPINION

19  A.   <u>Legal Standard</u>

20    The Hague Convention on the Civil Aspects of International

21  Child Abduction ("Convention") was adopted in 1980 with the goal

22  of securing "the prompt return of children wrongfully removed to

23  or retained in any Contracting State; and . . . to ensure that

24  rights of custody and of access under the law of one Contracting

25  State are effectively respected in the other Contracting

26  States."  Convention, Preamble, 19 I.L.M. 1501, 1501; 1980 WL

27  115586 (1980).  Both the United States and Argentina are

28  signatories to the Convention.  <u>Id.</u>  The United States

1  implemented the Convention through the enactment of the

2  International Child Abduction Remedies Act ("ICARA"), 42 U.S.C.

3  § 11601 *et seq.*

4      Under the Convention and ICARA, a court must order the

5  return of a "wrongfully" abducted child to the parent from whom

6  she was taken.  Gaudin v. Remis, 415 F.3d 1028, 1034 (9th Cir.

7  2005).  Accordingly, the petitioner has the burden of proving by

8  a preponderance of the evidence a "wrongful" removal or

9  retention.  See § 11603(e)(1).  The respondent then bears the

10  burden of establishing the applicability of any of the

11  affirmative defenses set out by the Convention to prevent the

12  child's repatriation.  § 11603(e)(2).  The affirmative defense

13  at issue here would defeat or delay the return of a child

14  wrongfully removed or retained if "there is a grave risk that

15  his or her return would expose the child to physical or

16  psychological harm or otherwise place the child in an

17  intolerable situation."  Convention, art. 13(b) ("grave risk

18  exception"), 19 I.L.M. 1501, 1502.  The grave risk exception

19  must be established by clear and convincing evidence.

20  § 11603(e)(2)(A).

21      B.  Discussion

22      Petitioner seeks the return of his daughter, S.C., to

23  Argentina.  Respondent does not dispute that S.C. is a habitual

24  resident of Argentina and is being wrongfully retained in the

25  United States, but she argues that S.C. should not be returned

26  because of the Convention's exception for cases in which the

27  child would face a grave risk of psychological harm if returned

28  to the non-abducting parent.  Respondent's Post Trial Brief,

Doc. #50, at 4.  Respondent had also raised the affirmative defense under Article 20 of the Convention for protection of human rights and fundamental freedoms and the affirmative defense under Article 13 for a mature child's objection in her brief in opposition to the Petition (Doc. #19).  However, she did not argue their application at trial or in her post-trial brief and consequently, the Court finds that these affirmative defenses have been abandoned.  Therefore, the sole issue before the Court is whether by clear and convincing evidence, there is a grave risk that S.C.'s return to Argentina would expose her to physical or psychological harm or otherwise place her in an intolerable situation.

       1.   Grave Risk Exception

     Respondent argues that S.C. is in grave risk of physical and psychological harm because S.C. has serious medical and mental health needs and the resources in place in Argentina, including Petitioner's understanding of S.C.'s needs, are gravely inadequate to provide the necessary care to S.C. Petitioner argues that Respondent has failed to establish by clear and convincing evidence that S.C. is in grave risk if she returns to Argentina.

     The grave risk exception should be "narrowly drawn." Cuellar v. Joyce, 596 F.3d 505, 508-09 (9th Cir. 2010) (quoting Asvesta v. Petroutsas, 580 F.3d 1000, 1020 (9th Cir. 2009)). "[T]he exception for grave harm to the child is not license for a court in the abducted-to country to speculate on where the child would be happiest.  Rather, the question is whether the child would suffer serious abuse, that is a great deal more than

6

1  minimal." <u>Gaudin v. Remis</u>, 415 F.3d 1028, 1035 (9th Cir. 2005)

2  (internal citations and quotation marks omitted).

3       The Ninth Circuit has further held that a parent may

4  establish a grave risk to defeat or delay the return of a child

5  "by showing that it would disrupt an ongoing course of medical

6  treatment and severely impact the child's health.  But the

7  parent would have to provide clear and convincing evidence both

8  (1) of the child's serious medical needs and (2) of the home

9  country's inability to provide the necessary care." <u>Cuellar v.</u>

10 <u>Joyce</u>, 596 F.3d at 511 (numbering added).  In <u>Cuellar</u>, the

11 father, argued, in part, that Panama lacked the medical services

12 that the child needed to treat "ataxia," which is a lack of

13 coordination that may be symptomative of a number of underlying

14 neurological conditions.  <u>Id.</u>  The court held that there was no

15 clear and convincing evidence of a medical condition.  <u>Id.</u>  Even

16 if the record did support a conclusion that the child exhibited

17 ataxia, there was no evidence that the child was undergoing a

18 regular course of treatment in the United States or that

19 treatment was not available in Panama.  <u>Id.</u>  Although the father

20 testified that Panama lacked the medical services that the child

21 needed, there was no evidence about the Panamanian health system

22 or that the father had any specialized knowledge about it.  <u>Id.</u>

23 Therefore, the court held that there was no basis to conclude

24 that returning the child to Panama would pose a grave risk of

25 harm.  <u>Id.</u>

26            a.   <u>Child's Serious Medical Needs</u>

27      Here, Petitioner provided the Court with medical

28 evaluations of S.C. by Dr. Crawford.  Dr. Crawford evaluated

7

1   S.C. and diagnosed her with dysthymic disorder, mixed receptive

2   expressive language disorder, learning disorder NOS, disorder of

3   Infancy, Childhood, or Adolescence NOS.  Psychological Report,

4   February 24, 2012, Ex. 63, at 5.  In her follow up report, Dr.

5   Crawford recommended S.C. undergo neuropsychological assessment

6   and she also determined that S.C. "runs the risk of psychotic

7   breakdown, and if not supported adequately is in danger

8   developing a Borderline Personality Disorder."  Psychological

9   Report, January 29, 2013, Ex. 64, at 5-6.  Petitioner argues

10  that Dr. Crawford's reports and testimony should be given little

11  weight because only Respondent hired Dr. Crawford and therefore,

12  her testimony and reports are not neutral.  However, nothing in

13  her testimony or reports reflects any strong bias to affect her

14  credibility.

15      Respondent also provided the Court with a Multidisciplinary

16  Evaluation Summary, conducted by the Kaiser Permanente Spectrum

17  Disorder Center and overseen by Dr. Bernal.  Multidisciplinary

18  Evaluation Summary, Ex. 62.  Based on this evaluation, S.C. was

19  diagnosed with Borderline Intellectual Functioning.  In

20  addition, Dr. Bernal testified that Borderline Intellectual

21  Functioning may manifest many different symptoms, including

22  dysphasia—a language delay.  S.C. was also diagnosed with a mood

23  disorder.  Id. at 12.  In support of the mood disorder

24  diagnosis, Petitioner and Petitioner's mother, Alicia Gobra,

25  also testified that S.C. suffers emotional outbursts.  The

26  evaluation summary adds that S.C.'s "difficulties put her at

27  risk for developing more stress, depression, and anxiety, as she

28  gets older.  [S.C.] is likely to have difficulties negotiating

8

1  the multiple and complex demands of the higher school grades.

2  She should be carefully monitored for increases in mood disorder

3  symptoms resulting from the increased demands expected of her."

4  Id.  Respondent asserts that the Court should disregard the

5  report and Dr. Bernal's testimony because the evaluation was not

6  neutral and the evaluating team, including Dr. Bernal, did not

7  have accurate information.  Although during trial Dr. Bernal

8  testified that knowing more about S.C. would have been valuable,

9  she did not state or suggest that it would have changed the

10  diagnosis.

11       Based on these evaluations, S.C. is currently undergoing a

12  regular course of treatment in the United States, including

13  weekly therapy sessions.  Respondent is also following the

14  general behavioral guidelines recommended in the

15  Multidisciplinary Evaluation Summary for S.C., which has helped

16  control S.C.'s emotional outbursts according to Respondent's

17  testimony.  Multidisciplinary Evaluation Summary, Ex. 62, at 14-

18  19.

19       Therefore, unlike the district court's finding in Cuellar

20  (i.e., that the child suffered of "ataxia," which was based on

21  testimony and written statements made by an unidentified

22  physician, a professor, and a registered nurse), here, there is

23  substantial and credible evidence to show that S.C. has

24  Borderline Intellectual Functioning and a mood disorder that may

25  develop into a more serious condition, including a Borderline

26  Personality Disorder.  Furthermore, there is evidence that there

27  is an ongoing course of medical treatment.  Accordingly, the

28  Court finds by clear and convincing evidence that S.C. has

serious medical needs.

     b. <u>Home Country's Inability to Provide the Necessary Care</u>

      i. <u>Medical Care</u>

  Respondent argues that in Argentina, S.C. does not have a support system that can actively work with her every day as recommended by Dr. Bernal.  Petitioner testified and provided affidavits about the medical care S.C. was receiving in Argentina before arriving to the United States.  However, the only recognized diagnosis in Argentina was of dysphasia, which as mentioned above is merely a symptom of S.C.'s condition.  <u>See</u> <u>e.g</u>. Dr. Roger's Note (Diagnosis), Ex. 20 (translation), at 1; Medical Record, Ex. 67 (translation), at 1-4.

  Nevertheless, although she was only diagnosed with dysphasia, she was under constant medical care in Argentina. <u>See</u> Medical Treatment Records, Ex. 9-11.  In addition, both Dr. Bernal and Dr. Crawford testified they knew little about the Argentinian health system and neither felt comfortable making broad statements about the services S.C. could receive in Argentina.  Further, Dr. Crawford in the January 29, 2013, Psychological Report stated that "[t]he Argentinean assessments though through [sic] in many ways, did not assess these areas of psychological functioning, and this is definitely needed." Psychological Report, January 29, 2013, Ex. 64, at 5. Therefore, even though the assessments did not asses specific areas of psychological functioning, she recognized that the assessments were thorough.  Moreover, during trial, neither doctor fundamentally disagreed with the Argentinian assessments.

1    In her post-trial brief, Respondent argues that "there is
2  no more health insurance in Argentina for S.C. which calls into
3  question whether she will even be provided any treatment at
4  all," but there is no evidence that S.C. will lack insurance in
5  Argentina.  Respondent's Post-Trial Brief at 25 n.2.  During the
6  trial, Respondent testified that she did not know who would be
7  S.C.'s health care providers if she were to return to Argentina.
8  In addition, there is no evidence that Respondent is
9  knowledgeable about the limits of the Argentinian health system
10  and any testimony about S.C.'s possible treatments in Argentina
11  would be speculation.  Finally, after receiving the microarray
12  genetic study conducted here in the United States, Dr. Amartino,
13  stated, "This result, obtained through state of the art
14  technology (not available in Argentina up to this date) confirms
15  previous diagnostic assumptions and changes nothing in the
16  therapeutic expectations, being multimodal rehabilitation and
17  integrated education the right treatments that the girl must
18  continue getting permanently as she was until the end of 2012."
19  Letter by Dr. Amartino, Ex. 17 (translation), at 1.  Thus, even
20  though Dr. Amartino admitted that the technology used to
21  diagnose S.C. is currently unavailable in Argentina, he believes
22  that continued therapy is necessary.

23    Therefore, while the Argentinian assessments of S.C. were
24  incomplete, there is insufficient evidence that S.C. cannot
25  receive the medical care she requires in Argentina.  At best,
26  the evidence demonstrates that S.C.'s medical care in the United
27  States may be better than that provided to her in Argentina.
28  Regardless, the comparison of whether one country's medical

1    opportunities are better than another's does not constitute a

2    grave risk of harm as contemplated by the drafters of the Hague

3    Convention nor is it within the purview of 42 U.S.C. § 11603.

4    In re Koc, 181 F. Supp. 2d 136, 156 (E.D. N.Y. 2001); Public

5    Notice 957, 51 Fed. Reg. 10494, 10,510 (March 26, 1986).

6    Accordingly, Respondent has failed to prove by clear and

7    convincing evidence that S.C.'s home country is unable to

8    provide the necessary care and, therefore, no grave risk of harm

9    if S.C. is returned to Argentina is present in this case.

10                        ii. Education

11        Respondent also argues that Argentina cannot meet S.C.'s

12   educational needs.  She testified that S.C. was struggling while

13   attending Armonia in Argentina and was denied participation in

14   English classes.  See Respondent's Post-Trial Brief at 7-8.  In

15   addition, Mr. Chakraverty and Ms. Deol testified that while

16   studying here in the United States, S.C. has made progress in

17   learning English and controlling her emotional outbursts.

18   However, Armonia is a school that integrates students with

19   Special Education Needs and S.C. had an integrated teacher while

20   she attended Armonia.  December 2012 School Statement, Ex. 25

21   (translation); Gutierrez Statement, Ex. 28 (translation).

22   Although Respondent disputes whether S.C. had a private teacher,

23   she concedes that S.C. was integrated at Armonia and had an

24   integrated teacher.  Respondent's Post-Trial Brief at 7.

25        While S.C. may be making progress, the evidence falls short

26   of meeting the burden of proof in this case.  Adequate education

27   is available in Argentina and in no way creates a grave risk of

28   harm.  Accordingly, the Court finds that Argentina is capable of

1  meeting S.C.'s educational needs.

2          2.  Intolerable Situation

3      Respondent urges the Court to consider the meaning of

4  "intolerable situation" under Article 13(b) as a separate

5  exception.  Specifically, Respondent argues that Petitioner's

6  inability to address his daughter's needs on a daily basis

7  creates an intolerable situation.

8      Respondent relies on the law review article by Merle H.

9  Weiner, Intolerable Situations and Counsel for Children:

10  Following Switzerland's Example in Hague Abduction Cases, 58 Am.

11  U. L. Rev. 335 (2008).  Mr. Weiner believes that "intolerable

12  situation" and "grave risk of harm" are separate exceptions and

13  "something may create an 'intolerable situation' for the child,

14  yet not cause the child a 'grave risk of physical or

15  psychological harm.'"  Id. at 348.  He believes that courts in

16  the United States should adopt the Swiss formulation of

17  "intolerable situation," which exists when the following

18  criteria are met: "a. placement with the parent who filed the

19  application is manifestly not in the child's best interests;

20  b. the abducting parent is not, given all of the circumstances,

21  in a position to take care of the child in the State where the

22  child was habitually resident immediately before the abduction

23  or if this cannot reasonably be required from this parent; and

24  c. placement in foster care is manifestly not in the child's

25  best interests."  Id. at 343.

26      Even if the Court were to accept Respondent's contention

27  that "intolerable situation" is a separate exception, she has

28  failed to establish the exception here by clear and convincing

13

1   evidence.  Petitioner's testimony demonstrated that he was

2   unaware of S.C.'s needs while she was in Argentina as evidenced

3   by his inability to give concrete examples of how he has

4   personally addressed S.C.'s medical and psychological needs.

5   When pressed by the Court, Petitioner only gave an example about

6   him fulfilling her desire to take voice lessons.  In addition,

7   Dr. Crawford in her report, found that Petitioner cares for S.C.

8   "but does not have much sense as to what a child['s] basic

9   physical and psychological needs are."  Psychological Report,

10  January 29, 2013, Ex. 64, at 6.  There is also evidence to

11  suggest that Petitioner has ignored S.C.'s hygiene, such as S.C.

12  having lice, and evidence suggesting that Petitioner was

13  sleeping in the same bed as S.C. until she was 12 and Petitioner

14  still bathed her at that age.  See Declaration of Cecilia

15  Eguiguren Laborde, Ex. 52, at 4; Psychological Report, February

16  24, 2012, Ex. 63, at 1-2.

17      However, this evidence at most creates an uncertainty of

18  whether Petitioner will be able to provide the necessary care if

19  S.C. were returned to Argentina now that he knows she has been

20  diagnosed with Borderline Intellectual Functioning and a mood

21  disorder.  In addition, the evidence of S.C.'s hygiene and her

22  relationship with her father are troubling but there is no

23  evidence of abuse or a serious health risk.  See Cuellar, 596

24  F.3d at 509-10 (holding that there was no grave risk despite

25  evidence that the child suffered a head injury, was sometimes

26  cared for by a sick relative, had frequent ear infections, and

27  had unexplained burns behind her earlobes); Stirzaker v.

28  Beltran, 2010 WL 1418388, at *8 (D. Idaho 2010) (holding that

1   there was no grave risk despite evidence that the child was

2   having difficulty in school and behavioral problems because of

3   the father's abuse in the form of inappropriate touching and

4   nudity in the home because it was not the court's role to

5   determine the appropriateness of one's behaviors or to resolve

6   the parties' custody dispute).  Therefore, there is insufficient

7   evidence to meet the high standard of clear and convincing

8   evidence required to show that returning S.C. to Argentina is

9   manifestly not in the child's best interest.  Given that

10  Respondent has failed to meet Mr. Weiner's first criteria, the

11  Court need not address the remaining two.  Accordingly,

12  Respondent has failed to show that S.C. would otherwise be

13  placed in an intolerable situation.

14            3.   Undertakings

15       Courts have the authority to impose conditions, known as

16  undertakings, to ensure that a potential harm does not manifest

17  when a child returns to his or her country of habitual

18  residence.  Krefter v. Wills, 623 F. Supp. 2d 125, 137 (D. Mass.

19  2009); see also Walsh v. Walsh, 221 F.3d 204, 219 (1st Cir.

20  2000)("A potential grave risk of harm can, at times, be

21  mitigated sufficiently by the acceptance of undertakings and

22  sufficient guarantees of performance of those undertakings.")

23  Several courts have recognized that "even when a grave risk of

24  harm is not present, that undertakings should be used 'to ensure

25  that a potential harm does not manifest when a child returns to

26  his or her country of habitual residence.'"  Rial v. Rijo, 1:10-

27  CV-01578-RJH, 2010 WL 1643995, at *3 (S.D. N.Y. Apr. 23,

28  2010)(citing Krefter, 623 F. Supp. 2d at 138 (D. Mass. 2009));

1   Kufner v. Kufner, 480 F. Supp. 2d 491, 515 n. 34 (D.R.I. 2007)

2   ("[W]here the potential for harm is real, even if it does not

3   meet the Article 13(b) definitions, this Court believes it has

4   an obligation to attempt to ensure that it does not manifest")

5   aff'd, 519 F.3d 33 (1st Cir. 2008); Feder v. Evans-Feder, 63

6   F.3d 217, 226 (3d Cir. 1995) (if "an unqualified return order

7   would be detrimental," "the court should investigate the

8   adequacy of undertakings . . . to ensure that [the child] does

9   not suffer short term harm")).

10      Here, both parties have argued that undertakings are either

11  unnecessary or do not eliminate the potential harm and, as

12  mentioned above, there is no grave risk of harm or an

13  intolerable situation under Article 13(b).  However, there is a

14  potential for harm if S.C. is returned to Argentina and the

15  Court has an obligation to attempt to ensure that it does not

16  manifest.  First, based on Dr. Crawford's report, which

17  emphasized S.C.'s need for her mother, Respondent should have a

18  continued role in S.C.'s life and therefore, Respondent should

19  be allowed consistent access to and visitation with S.C.

20  Second, it is clear that S.C. is in need of immediate and

21  continuing counseling and therapy for her Borderline

22  Intellectual Functioning and mood disorder.  Accordingly, the

23  Court imposes narrowly focused undertakings outlined below to

24  ensure that S.C. receives the necessary medical treatments and

25  ensures that Respondent is allowed access to and visitation with

26  S.C.  See Kufner, 480 F. Supp. 2d at 516 (adopting similar

27  undertakings to ensure that the children received medical care

28  and the respondent was allowed to visit the children).

16

1

2                    4.   Attorney's Fees

3        Petitioner requests attorney's fees under Article 26 of the

4   Convention and 42 U.S.C. § 11607(b).   However, Petitioner has

5   neither stated the amount sought nor included an affidavit

6   itemizing all costs requested and detailing the services

7   rendered.   Fed. R. Civ. P. 54(d)(2)(B)(i); L.R. 293.

8   Accordingly, Petitioner shall file a separate motion for

9   attorney's fees that complies with the Federal Rules of Civil

10  Procedure and Local Rules.

11

12       III.   CONCLUSIONS OF LAW AND UNDERTAKINGS

13       For all of the reasons set forth above, the Court concludes

14  as follows:

15       1.   S.C.'s country of habitual residence is Argentina.

16       2.   Petitioner proved by a preponderance of the evidence

17  that S.C. was wrongfully retained in the United States by

18  Respondent within the meaning of the Convention and ICARA, 42

19  U.S.C. § 11603.

20       3.   Respondent failed to prove by clear and convincing

21  evidence that returning S.C. to Argentina would expose her to a

22  grave risk of physical or psychological harm under Article 13(b)

23  of the Convention and ICARA, § 11603(e)(2)(A).

24       4.   Respondent failed to establish by clear and convincing

25  evidence that returning S.C. to Argentina would otherwise place

26  her in an intolerable situation under Article 13(b) of the

27  Convention and ICARA, § 11603(e)(2)(A).

28       5.   The Court finds that Petitioner does not have the same

17

1  level of understanding and appreciation for S.C.'s emotional and

2  psychological needs as Respondent.  Petitioner has, at times,

3  also isolated S.C. from Respondent without good cause (i.e.,

4  because of his own animosity toward Respondent S.C. has not been

5  allowed visits with her mother).  These shortcomings may place

6  S.C. at risk but do not, in and of themselves, create a grave

7  risk of harm or an intolerable situation such that the Petition

8  should be denied.  However, because the Court holds that there

9  is a potential for harm, undertakings are necessary.

10      Given these conclusions, the Petition is granted.  This

11  Order is subject to the following undertakings:

12      1.   Petitioner shall provide written proof to this Court

13  that he has, in place, a plan under which S.C. will obtain the

14  necessary medical treatment in Argentina for her Borderline

15  Intellectual Functioning and mood disorder. This written plan

16  should include a description of the type and duration of medical

17  services that will be provided to S.C. as well as a list of

18  S.C.'s proposed health care providers and therapists in

19  Argentina.  Petitioner's submission to this Court should also

20  include a specific description as to how Petitioner plans to pay

21  for S.C.'s health care needs.

22      2.   Petitioner shall submit a declaration under penalty of

23  perjury that states that he will make a good faith effort to

24  reach an agreement with Respondent within thirty (30) days of

25  this Order that will be presented to the appropriate court in

26  Argentina for approval as a court ordered visitation regime.

27      3.   Petitioner shall submit an amended "Order Directing

28  the Return of S.C. to Argentina" for the Court's approval.

1    Petitioner is to include in this proposed order a specific date,

2    time, and location--other than the San Joaquin County District

3    Attorney's Office--as to when S.C. is to be delivered to him.

4    The Court will not execute this Order until it is satisfied that

5    Petitioner has complied with Undertakings 1 and 2. The Court

6    will also not allow S.C. to be delivered to anyone other than

7    Petitioner or, with the permission of Petitioner, S.C.'s

8    grandmother, Alicia Groba, for return to Argentina.

9

10                        IV.   ORDER

11        For the reasons set forth above, the Court GRANTS

12   Petitioner's Petition for Return of Child.  The Court recognizes

13   that the law compels this result.  If, however, this were a best

14   interest of the child case, this Order would not be in the best

15   interest of S.C.  Petitioner obtained the victory he wanted, but

16   this is a Pyrrhic victory.  As S.C. grows older, parental

17   challenges will arise and she will be better off if Petitioner

18   and Respondent are not at odds with one another. S.C. is a child

19   with significant needs and developmental challenges that can only

20   be met with the involvement and support of both of her parents.

21   Any attempt by either parent to raise S.C. alone is doomed to

22   failure and could result in serious and permanent damage to her.

23   Accordingly, the Court strongly urges the parties here to act

24   only in the best interests of their daughter and quickly resolve

25   the custody and visitation issues before the court in Argentina.

26        Any motion for attorney's fees by Petitioner shall be filed

27   within twenty (20) days of this Order.  Respondent shall have

28   ten (10) days from date of service to file her brief in

                                19

1    response, asserting why the requested award is "clearly

2    inappropriate."   See 42 U.S.C. § 11607(b)(3).   Petitioner may

3    file a reply brief within ten (10) days of Respondent's brief.

4         IT IS SO ORDERED.

5    Dated: January 10, 2014

6

7                                     _____
                                      JOHN A. MENDEZ,
                                      UNITED STATES DISTRICT JUDGE
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28